STATE OF NORTH CAROLINA v. ANTHONY BURROUGHS

No. COA06-1263

(Filed 21 August 2007)

**Search and Seizure— traffic checkpoint—required trial court findings**

The trial court is not required to make extensive inquiries into the purpose behind every traffic checkpoint, no evidence was brought forward in this case to suggest that the stated purpose behind this checkpoint (sobriety) was a mask for another, unconstitutional purpose, and an order excluding evidence from the sobriety checkpoint was reversed. However, the case was remanded for further findings as to the manner in which this individual stop was conducted.

Appeal by the State from an order entered 3 August 2006 by Judge Karl Adkins in Mecklenburg County Superior Court. Heard in the Court of Appeals 5 June 2007.

*Attorney General Roy A. Cooper, III, by Special Counsel Isaac T. Avery, III and Assistant Attorneys General William B. Crumpler and Michael R. Epperly, for the State-appellant.*

*Nixon, Park, Gronquist & Foster, PLLC, by James Gronquist, for defendant-appellee.*

*Morrow, Alexander & Porter PLLC, by John C. Vermitsky, for the North Carolina Academy of Trial Lawyers, amicus curiae.*

HUNTER, Judge.

The State appeals from an order granting a pretrial motion to suppress certain evidence in the case against Anthony Burroughs ("defendant"), who was charged with driving while impaired ("DWI"). After careful review, we reverse and remand for additional findings of fact.

On 26 March 2005, officers from the Charlotte-Mecklenburg Police Department ("CMPD") set up a DWI checkpoint (also referred to as a "sobriety checkpoint") on a certain section of Park Road in Charlotte. Defendant was stopped at the DWI checkpoint by Officer Matthew Pressley. The officer asked defendant how he was doing, explained that the officers were conducting a DWI checkpoint, and asked defendant for his driver's license, which defendant gave him.

Officer Pressley testified at the hearing on the motion to suppress that he noticed defendant's eyes were glossy and bloodshot and that his breath had a strong odor of alcohol. He also testified that defendant admitted upon questioning that he had consumed two glasses of wine half an hour earlier. Officer Pressley asked defendant to exit his car and submitted him to several alcohol screening tests. As a result of these tests, Officer Pressley believed defendant was impaired and placed him under arrest.

Defendant entered a plea of guilty in district court to the charge of DWI on 8 December 2005. On 3 February 2006 and 3 April 2006, defendant filed motions in superior court to suppress the evidence derived from the DWI checkpoint stop, arguing that the checkpoint was unconstitutional. On 3 August 2006, the court issued an order suppressing the evidence obtained from the stop pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and N.C. Gen. Stat. § 20-16.3 (2005). The State appeals from this order.

The trial court based its holding on the motion to suppress almost entirely on this Court's decision in *State v. Rose*, 170 N.C. App. 284, 612 S.E.2d 336 (2005). Of its fifteen conclusions of law, the first thirteen concern whether or not the checkpoint itself was constitutional, and twelve of those thirteen directly rely on *Rose*:

2. That the decision of the North Carolina Court of Appeals in State v. Rose, 170 N.C. App. 284, 612 S.E.2d 336 (2005)[,] is applicable to the facts in this case;

3. In Rose, the court stated that trial courts are required to make findings of fact regarding the "primary programmatic purpose" of a checkpoint based on the decision in Indianapolis v. Edmond, 531 U.S. 32[,] 148 L.Ed.2d 333, 121 S. Ct. 447 (2000);

4. That the trial court cannot simply accept the State's invocation of a proper purpose but must examine the available evidence to determine the purpose at the programmatic level and cannot probe the minds of individual officers;

5. That the State has the burden of establishing that the primary programmatic objective, and not the subjective intent of the officer for initiating a suspicionless vehicle stop, was not merely to further general crime control;

6. That even an apparent[ly] lawful purpose is insufficient without additional information that the lawful purpose was the primary programmatic purpose and that the checkpoint did not have a multi-purpose objective;

7. That in this case the "checkpoint plan" contained information about the location of the checkpoint and assertions, but no documentation, as to why the decision was made at the programmatic level to place the checkpoint at the place and at the time it was established;

8. That the [t]estimony presented relied solely on Officer Pressley's explanation for why the checkpoint was an appropriate DWI Checkpoint for that time and location. Officer Pressley was not a supervisor at the programmatic level as contemplated by State v. Rose, and the State offered no testimony from an officer acting at the programmatic level. As a result, this Court was deprived of the opportunity to conduct a close review of the checkpoint scheme[,] a review which is mandated by the United States Supreme Court; see Ferguson

v. City of Charleston, 532 U.S. 67 (2001). It is the State's burden to prove the primary programmatic purpose of a checkpoint and to provide the trial judge with sufficient evidence to make a determination as to whether a particular checkpoint passes constitutional muster. The State failed to carry its burden in this matter;

9. That the Court of Appeals in Rose specifically prohibits reliance on the individual arresting officer's primary purpose or intent when inquiring into the programmatic purpose of the checkpoint;

10. That Park Road in Charlotte[,] North Carolina, is a lengthy stretch of road from downtown Charlotte to Pineville, North Carolina, and runs through diverse areas of town involving industrial, residential, and commercial areas which present a diverse number of challenges for law enforcement activity which could involve use of roadblocks or checkpoints;

11. That without more information contained in the plan or communicated from the programmatic level, the court cannot ascertain the primary programmatic purpose of the checkpoint in issue, and whether the checkpoint was sufficiently tailored by a supervisory official to permit a suspicionless stop of a vehicle;

12. That the checkpoint plan as presented fails to meet the necessary constitutional and statutory standards as set out in State v. Rose, 170 N.C. App. 284, 612 S.E.2d 336 (2005).

13. That the testimony presented fails to prove the primary purpose in implementing the roadblock was a "Sobriety Checking Station" and the Court cannot presume from an unsubstantiated record that the constitutional requirements have been satisfied. See Rose at 341 citing Baker v. State, 252 Ga. App. 695, 698-99, 556 S.E.2d 892, 897 (2001)[.]

Because of this heavy reliance on our holding in Rose, we believe a close examination of that opinion is appropriate here. First, however, a brief summary of the case on which Rose in turn heavily relies— City of Indianapolis v. Edmond, 531 U.S. 32, 148 L. Ed. 2d 333 (2000)—is in order.

In Edmond, the defendant challenged a checkpoint with the stated and actual purpose of detecting narcotics. Id. at 34, 148

L. Ed. 2d at 339. In its opinion, the Court summarized a series of its earlier cases which had considered the constitutionality of certain programmatic purposes, including sobriety and border patrol checks, and noted that this case presented for the first time the programmatic purpose of narcotics possession. *Id.* at 37-40, 148 L. Ed. 2d at 340-42. The Court then proceeded to carefully consider whether such a purpose was constitutional, noting that "our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion." *Id.* at 41, 148 L. Ed. 2d at 343. Finally, the Court concluded that the purpose of checking for narcotics possession was unconstitutional because it is a checkpoint intended to "uncover evidence of ordinary criminal wrongdoing," and as such "the program contravenes the Fourth Amendment." *Id.* at 42, 148 L. Ed. 2d at 343.

This Court applied the principles of *Edmond* in *Rose*. The language in *Rose* requiring an examination of a checkpoint's purpose—specifically, that the trial court must " 'examine the available evidence to determine the primary purpose of the checkpoint program' "—comes directly from *Edmond*. *Rose*, 170 N.C. App. at 289, 612 S.E.2d at 339 (quoting *Edmond*, 531 U.S. at 46, 148 L. Ed. 2d at 347). In *Rose*, five police officers were together one evening and decided to " 'spontaneously throw [a checkpoint] up' " for the purpose, they stated, of checking licenses and registrations on a certain road in Onslow County. *Rose*, 170 N.C. App. at 291, 612 S.E.2d at 341. While operating the checkpoint, the officers noticed the passengers in one stopped car " 'seemed nervous' " and, after questioning, discovered that they were in possession of marijuana and a gun. *Id.* at 286-87, 612 S.E.2d at 338. The defendant was convicted for various counts of possession of controlled substances and carrying a concealed weapon. *Id.* at 287, 612 S.E.2d at 338. He appealed his conviction to this Court, arguing that the trial court erred in denying his motion to suppress the evidence obtained at the checkpoint. *Id.*

This Court reversed, remanding the case for the trial court to make findings of fact as to the checkpoint's purpose. *Id.* at 285-86, 612 S.E.2d at 337. Although the officers had *stated* that the checkpoint's purpose was to check licenses and registration, the Court pointed to several facts that belied that statement. First, the officers who had testified at trial had readily admitted that no plan for the checkpoint had been created or approved beforehand, and the State had offered no evidence whatsoever as to "why there was a particular need for a checkpoint in this particular area of the county." *Id.* at 291, 612 S.E.2d

at 341. Also, no evidence had been offered that this one portion of the county "was having a larger problem with unlicensed or unregistered drivers than another part," and thus that any checkpoint there was in fact meant to apprehend persons with faulty licenses or registrations. *Id.* at 291-92, 612 S.E.2d at 341.

Further, four of the five officers involved in the checkpoint were narcotics detectives, and the arrest at issue was not for a faulty license or registration, but for possession of drugs and a weapon. *Id.* at 290, 612 S.E.2d at 340. In conducting the checkpoint, one officer would examine drivers' licenses and registrations while another officer would "scan the inside of the vehicle and walk around it," behavior that the Court noted was never linked by testimony to the stated purpose of checking licenses and registrations; indeed, the Court noted, "it appears that the function of the second officer may have been to scan for possible criminal activity." *Id.* at 292, 612 S.E.2d at 341.

The Court concluded in *Rose* that the evidence presented at trial clearly tended to show that the actual purpose of the checkpoint was simply to check the vehicles for "possible criminal activity"—specifically, narcotics possession—a purpose which had been held unconstitutionally broad by the United States Supreme Court. *Rose*, 170 N.C. App. at 292-93, 612 S.E.2d at 341-42; *see also Edmond*, 531 U.S. at 32, 148 L. Ed. 2d at 333-34. The trial court, however, had taken the officers' testimony as to the checkpoint's purpose at face value and ignored the weight of the evidence that contradicted those statements. As such, the Court held, the trial court's "fail[ure] to make findings of fact regarding the 'primary programmatic purpose' of the checkpoint" meant that it had not properly determined the checkpoint's actual purpose, nor considered whether that actual purpose was constitutional. *Id.* at 285-86, 612 S.E.2d at 337.

Thus, our holding in *Rose* was that where contradictory evidence exists as to the actual primary purpose of a checkpoint program, the trial court must examine the available evidence to determine the actual purpose, because bare assertions of a constitutional purpose cannot be allowed to mask actual purposes that are unconstitutional. In *Rose* this Court cited *Edmond* on this point:

Petitioners argue that the Indianapolis checkpoint program is justified by its lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations. If this were the case, however, law enforcement authorities would

be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check. *For this reason, we examine the available evidence to determine the primary purpose of the checkpoint program.*

*Edmond*, 531 U.S. at 46, 148 L. Ed. 2d at 346-47 (citation omitted) (emphasis added).

In *Edmond*, the Supreme Court noted that there was no question as to whether the actual purpose of the checkpoint was the same as its stated purpose; thus, it focused its inquiry on the constitutionality of that purpose. In *Rose*, however, this Court was forced to closely examine the facts surrounding the checkpoint's purpose because its alleged purpose—to check licenses and registrations, which the Supreme Court has held to be constitutional—was belied by substantial evidence to the contrary showing the checkpoint's actual purpose was almost certainly to check for narcotics, which the Supreme Court has expressly held to be unconstitutional. This, then, is why this Court held in *Rose* that the trial court was required to make findings of fact as to the checkpoint's purpose: Not because every trial court in every case must make such findings of fact, but because in this specific case, bare statements that the checkpoint had a constitutional purpose were unreliable.

The trial court, as mentioned above, relied heavily on *Rose*. It stated in Conclusion of Law 3 that our opinion in *Rose* "stated that trial courts are required to make findings of fact regarding the 'primary programmatic purpose' of a checkpoint based on the decision in Indianapolis v. Edmond[.]" The court then stated in Conclusions of Law 7 and 8 that no proper documentation as to the programmatic purpose was presented. This dearth of evidence as to the checkpoint's programmatic purpose, the court stated in Conclusions of Law 9 and 11, meant it could not evaluate whether the checkpoint was "sufficiently tailored" to permit a suspicionless stop. Therefore, the court held, the evidence must be suppressed.

This holding misconstrues the principles of *Rose* and *Edmond*. Both cases hold that only certain purposes for checkpoints are constitutionally allowed, and where the stated purpose is at odds with the evidence brought forth, the trial court must inquire as to the actual purpose. The trial court's order in this case, however, misapplies these principles. Neither *Rose* nor *Edmond* mandates that every trial court make extensive inquiries into the purpose behind every checkpoint. No evidence was brought forward in the case at hand

to suggest that the stated purpose of the checkpoint (sobriety), which has been affirmatively declared constitutional by both this Court and the Supreme Court, was a mask for another, unconstitutional purpose. As such, the trial court was in error in holding that the lack of such evidence required it to exclude the evidence obtained by the stop.

From the available evidence, it is clear to this Court that the actual purpose of the checkpoint was the same as its stated purpose: To check for sobriety. Because such a purpose has been expressly held constitutional, and because the trial court misconstrued our holding in *Rose*, we reverse the trial court's order.

However, the constitutional inquiry into the checkpoint does not end here. As the trial court's final three conclusions of law correctly note, after a checkpoint has been found constitutional, the next inquiry must be whether the checkpoint was conducted in a constitutional manner—that is, whether the individual stop at issue was itself constitutional. *See Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342 ("even if a checkpoint is for one of the permissible purposes, '[t]hat does not mean the stop is automatically, or even presumptively, constitutional. It simply means that we must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances' "). As our Supreme Court noted in *State v. Mitchell*, 358 N.C. 63, 592 S.E.2d 543 (2004), "checkpoint stops conform to the Fourth Amendment if they are reasonable. '[W]e must judge [the] reasonableness [of a checkpoint stop], hence, its constitutionality, on the basis of individual circumstances.' " *Id.* at 66, 592 S.E.2d at 545 (quoting *Illinois v. Lidster*, 540 U.S. 419, 426, 157 L. Ed. 2d 843, 852 (2004)). The trial court's order considers this question, but only briefly, in its final three conclusions of law. As such, we remand this case to the trial court for further findings of fact as to the manner in which this individual stop was conducted.

Because the trial court's order misapplies *Rose*, we reverse its order excluding the evidence of the stop but remand the case for further findings of fact as to the constitutionality of the individual stop of defendant.

Reversed and remanded.

Judges WYNN and BRYANT concur.