STATE OF NORTH CAROLINA v. THOMAS MARLAND VEAZEY

No. COA07-1569

(Filed 1 July 2008)

**1. Motor Vehicles— driving while impaired—driver's license checkpoint—lawful purpose—reasonableness**

The trial court erred in a driving while impaired case by concluding the pertinent driver's license checkpoint had a lawful purpose and was reasonable, and the case is remanded for new findings and conclusions regarding the primary programmatic purpose of the checkpoint, because: (1) where there is evidence in the record that could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose, and the record contained conflicting evidence from the trooper's testimony regarding the State's primary purpose in conducting the checkpoint; (2) the trial court simply recited two of the trooper's stated purposes for the checkpoint and did not make an independent finding regarding the actual primary purpose, thus precluding an issuance of a conclusion of law regarding the lawfulness of the primary purpose; (3) the trial court failed to make adequate findings on the first two prongs under *Brown*, 443 U.S. 47 (1979), and its findings on the third *Brown* prong alone cannot support its oral conclusion that the checkpoint was not an unreasonable detention; and (4) the trial court was required to explain why it concluded that, on balance, the public interest in the checkpoint outweighed the intrusion on defendant's protected liberty interests since its written findings tend to weigh in favor of a conclusion that the checkpoint was an unreasonable detention. If on remand the trial court determines the State's primary purpose for

STATE v. VEAZEY

[191 N.C. App. 181 (2008)]

the checkpoint was lawful, it must also issue new findings and conclusions regarding the reasonableness of the checkpoint.

**2. Motor Vehicles— driving while impaired—driver's license checkpoint—secondary checking station**

The trial court did not err in a driving while impaired case by concluding that a trooper did not unreasonably detain defendant by directing him to a secondary checking station after an initial driver's license checkpoint stop and by admitting evidence gained as a result of this secondary stop because: (1) the trooper testified that when defendant presented his driver's license during the initial checkpoint detention, the trooper detected a strong odor of alcohol in the vehicle and also observed that defendant's eyes were red and glassy; and (2) these facts provided a sufficient basis for reasonable suspicion permitting the trooper to pursue further investigation and detention of defendant.

Judge STEELMAN concurring in result in separate opinion.

Appeal by Defendant from order entered 19 November 2007 by Judge L. Todd Burke in Superior Court, Stokes County. Heard in the Court of Appeals 21 May 2008.

*Attorney General Roy Cooper, by Assistant Attorney General Tamara S. Zmuda, for the State.*

*The Dummit Law Firm, by E. Clarke Dummit, for Defendant.*

McGEE, Judge.

The record in this case shows that around 5:00 p.m. on 1 January 2006, Trooper F.K. Carroll (Trooper Carroll) of the North Carolina State Highway Patrol set up a drivers' license checkpoint on U.S. Highway 311 near Walnut Cove, North Carolina. Trooper Carroll set up the checkpoint with another trooper but could not remember the name of the second trooper. At approximately 5:40 p.m., a vehicle driven by Thomas Marland Veazey (Defendant) approached the checkpoint. Trooper Carroll asked Defendant for his driver's license and registration. Defendant produced an out-of-state driver's license, although his vehicle was registered in North Carolina. During this encounter, Trooper Carroll detected a strong odor of alcohol coming from Defendant's vehicle, and he saw that Defendant's eyes were red and glassy. Trooper Carroll instructed Defendant to drive his vehicle to the shoulder of the highway. Trooper Carroll then performed a

sobriety test on Defendant and, after determining that Defendant was impaired, arrested Defendant for driving while impaired. A chemical analysis later determined that Defendant's blood-alcohol level at the time of his arrest was 0.08.

Prior to trial, Defendant filed a motion to suppress all evidence obtained by Trooper Carroll as a result of the checkpoint. Defendant argued that the checkpoint violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

The trial court heard Defendant's motion on 26 February 2007. Trooper Carroll was the sole witness who testified at the hearing. Following Trooper Carroll's testimony, the trial court made the following oral findings and conclusions:

> [The Court is] going to deny the Motion to Suppress, and finds that the license checkpoint was not an unreasonable detention; and therefore, was valid under the Fourth Amendment. The officers had complied with the necessities of setting up a checkpoint. There were two officers who participated in this checkpoint . . . . The trooper checked with his supervisor and verified that he was going to have a—set up a checkpoint. He's not met with any objection. Said the purpose of the checkpoint was to—for license checks, make sure persons were observing the motor vehicle statutes, State of North Carolina. It was set up in a safe place, systematically done. They chose to stop every vehicle. And that upon stopping [Defendant] in this case the officers, the officer observed a strong odor of alcohol. And he further investigated the matter to make a determination as to whether or not [Defendant] was operating a vehicle while impaired.
>
> Court finds those facts and finds as a matter of law that the license checkpoint was not an unreasonable detention, and was valid under the Fourth Amendment.

The trial court did not reduce its order to writing at that time.

Defendant pleaded no contest to driving while impaired on 5 June 2007, and he preserved his right to appeal the trial court's denial of his motion to suppress. The trial court then sentenced Defendant to a term of sixty days in prison, but suspended Defendant's sentence and placed him on probation for a period of twelve months. Defendant then gave oral notice of appeal from the trial court's denial of his motion to suppress.

The trial court issued a final written order denying Defendant's motion to suppress on 19 November 2007, more than five months after Defendant's plea and the trial court's entry of judgment. However, in contrast to the trial court's prior oral findings of fact, the trial court's written findings characterized Trooper Carroll's testimony as containing admissions that the checkpoint was a "generalized checking station," and that Trooper Carroll had significant discretion regarding the operation of the checkpoint. Despite these findings, however, the trial court concluded:

1. That Trooper Carroll complied with the requirements for conducting a checking station.

2. The evidence obtained need not be suppressed.

The trial court also voided Defendant's prior oral notice of appeal on the ground that it was entered prior to the trial court's entry of a final written order denying Defendant's motion to suppress. Defendant filed a new notice of appeal on 19 November 2007 from the trial court's final written order denying his motion to suppress.

I.

The United States Supreme Court has long held that the Fourth Amendment reasonableness standard usually requires that a search or seizure be based on either consent or individualized suspicion of the person to be searched or seized. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 20-21, 20 L. Ed. 2d 889, 905-06 & n.18 (1968). However, the Supreme Court also has held that "the Fourth Amendment imposes no irreducible requirement of such suspicion," and has recognized certain limited exceptions to the general rule requiring individualized suspicion. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 49 L. Ed. 2d 1116, 1130 (1976). For example, police may briefly detain vehicles at a roadblock checkpoint without individualized suspicion, so long as the purpose of the checkpoint is legitimate and the checkpoint itself is reasonable. *See id.* at 561-62, 49 L. Ed. 2d at 1130-31 (upholding the constitutionality of a checkpoint located near the United States-Mexico border and designed to locate undocumented persons); *see also Illinois v. Lidster*, 540 U.S. 419, 427-28, 157 L. Ed. 2d 843, 852-53 (2004) (holding that police did not violate the Fourth Amendment by conducting a checkpoint aimed at gathering information regarding an earlier crime); *Michigan State Police v. Sitz*, 496 U.S. 444, 455, 110 L. Ed. 2d 412, 423 (1990) (holding that police complied with constitutional requirements in conducting a checkpoint designed to find intoxicated drivers).

When considering a challenge to a checkpoint, the reviewing court must undertake a two-part inquiry to determine whether the checkpoint meets constitutional requirements. First, the court must determine the primary programmatic purpose of the checkpoint. *City of Indianapolis v. Edmond*, 531 U.S. 32, 40-42, 148 L. Ed. 2d 333, 343 (2000). In *Edmond*, the United States Supreme Court distinguished between checkpoints with a primary purpose related to roadway safety and checkpoints with a primary purpose related to general crime control. According to the Court, checkpoints primarily aimed at addressing immediate highway safety threats can justify the intrusions on drivers' Fourth Amendment privacy interests occasioned by suspicionless stops. *Id.* at 41-43, 148 L. Ed. 2d at 343-44; *see, e.g., Sitz*, 496 U.S. at 455, 110 L. Ed. 2d at 423 (upholding a checkpoint with a primary purpose of finding intoxicated drivers); *Delaware v. Prouse*, 440 U.S. 648, 663, 59 L. Ed. 2d 660, 673-74 (1979) (suggesting that a checkpoint with a primary purpose of checking drivers' licenses and vehicle registrations would be permissible under the Fourth Amendment). However, the *Edmond* Court also held that police must have individualized suspicion to detain a vehicle for general crime control purposes, and therefore a checkpoint with a primary purpose of general crime control contravenes the Fourth Amendment. *Edmond*, 531 U.S. at 41-42, 148 L. Ed. 2d at 343-44 (finding unconstitutional a checkpoint with a primary purpose of interdicting illegal narcotics and stating that "[w]ithout drawing the line at roadblocks designed primarily to serve the general interest in crime control, the Fourth Amendment would do little to prevent such intrusions from becoming a routine part of American life").

The Supreme Court in *Edmond* also noted that a checkpoint with an invalid primary purpose, such as checking for illegal narcotics, cannot be saved by adding a lawful secondary purpose to the checkpoint, such as checking for intoxicated drivers. *Id.* at 46, 148 L. Ed. 2d at 346-47. Otherwise, according to the Court, "law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check. For this reason, [courts must] examine the available evidence to determine the primary purpose of the checkpoint program." *Id.* at 46, 148 L. Ed. 2d at 347.

Second, if a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint, "[t]hat does not mean the stop is automatically, or even presumptively, constitutional. It simply means that [the court] must judge its reasonableness, hence,

its constitutionality, on the basis of the individual circumstances." *Lidster*, 540 U.S. at 426, 157 L. Ed. 2d at 852. To determine whether a checkpoint was reasonable under the Fourth Amendment, a court must weigh the public's interest in the checkpoint against the individual's Fourth Amendment privacy interest. *See, e.g., Martinez-Fuerte*, 428 U.S. at 555, 49 L. Ed. 2d at 1126. In *Brown v. Texas*, 443 U.S. 47, 61 L. Ed. 2d 357 (1979), the United States Supreme Court held that when conducting this balancing inquiry, a court must weigh "[(1)] the gravity of the public concerns served by the seizure, [(2)] the degree to which the seizure advances the public interest, and [(3)] the severity of the interference with individual liberty." *Id.* at 51, 61 L. Ed. 2d at 362. If, on balance, these factors weigh in favor of the public interest, the checkpoint is reasonable and therefore constitutional. *See, e.g., Lidster*, 540 U.S. at 427-28, 157 L. Ed. 2d at 852-53.

A.

When reviewing a trial court's denial of a motion to suppress, we must first determine whether the trial court's findings of fact are supported by competent evidence. If so supported, the trial court's findings are binding on appeal. *State v. Rose*, 170 N.C. App. 284, 287, 612 S.E.2d 336, 338-39, *disc. review denied*, 359 N.C. 641, 617 S.E.2d 656 (2005). We must then determine whether the trial court's findings support its conclusions of law. *Id.* at 287-88, 612 S.E.2d at 339.

The State argues that when conducting our review, this Court should only consider the trial court's oral findings and conclusions made at the 26 February 2007 hearing on Defendant's motion to suppress. According to the State, once Defendant gave oral notice of appeal on 5 June 2007, the trial court no longer had jurisdiction to enter a written order containing findings of fact that differed from those it announced on 26 February 2007. *See State v. Davis*, 123 N.C. App. 240, 242-43, 472 S.E.2d 392, 393 (1996) (stating that "[t]he general rule is that the jurisdiction of the trial court is divested when notice of appeal is given, except that the trial court retains jurisdiction for matters ancillary to the appeal, including settling the record on appeal. In addition, a court of record has the inherent power to make its records speak the truth and, to that end, to amend its records to correct clerical mistakes or supply defects or omissions therein." (internal citation omitted)). The State argues that because the trial court was not correcting a clerical error in its records, and because the findings of fact in the written order did not reflect the truth of what the trial court had previously announced, the trial court's written order should be vacated for lack of jurisdiction. The

State further argues that the trial court's 26 February 2007 oral findings and conclusions should be reinstated.

Our Court has previously vacated a trial court's amended judgment and reinstated the original judgment where the amended judgment corrected non-clerical judicial errors and was issued after the appealing party gave notice of appeal. *See State v. Bullock*, 183 N.C. App. 594, 598, 645 S.E.2d 402, 407, *disc. review denied*, 361 N.C. 570, 650 S.E.2d 817 (2007); *Davis*, 123 N.C. App. at 243, 472 S.E.2d at 394. However, we have not previously determined whether a written order containing findings of fact, entered after the appealing party gave notice of appeal, must be vacated if the written findings differ from oral findings made by the trial court prior to the notice of appeal. We find it unnecessary to reach this question in the present case. As we discuss below, we reach the same holding whether we consider the trial court's 26 February 2007 oral findings and conclusions or the trial court's 19 November 2007 written findings and conclusions.

B.

[1] We begin our analysis by focusing on the primary programmatic purpose of the checkpoint. Our Court has previously held that where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose. *State v. Burroughs*, 185 N.C. App. 496, 499-500, 648 S.E.2d 561, 565-66 (2007). However, where there is evidence in the record that could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose. *Id.* at 499, 648 S.E.2d at 565. In such cases, the trial court "may not 'simply accept the State's invocation' of a proper purpose, but instead must 'carr[y] out a close review of the scheme at issue.' " *Rose*, 170 N.C. App. at 289, 612 S.E.2d at 339 (quoting *Ferguson v. City of Charleston*, 532 U.S. 67, 81, 149 L. Ed. 2d 205, 218 (2001)). This type of searching inquiry is necessary to ensure that "an illegal multipurpose checkpoint [is not] made legal by the simple device of assigning 'the primary purpose' to one objective instead of the other[.]" *Id.* at 290, 612 S.E.2d at 340 (quotation omitted); *see Edmond*, 531 U.S. at 46, 148 L. Ed. 2d at 346-47.

The record in this case contains conflicting evidence regarding the State's primary purpose in conducting the checkpoint. During the State's direct examination, the State questioned Trooper Carroll about the purpose of the checkpoint:

**STATE v. VEAZEY**

[191 N.C. App. 181 (2008)]

[THE STATE]:  And what was the purpose of that checkpoint?

. . . .

[TROOPER CARROLL]:  To enforce any kind of motor vehicle law violations we come in contact with.

[THE STATE]:  And did you have a predetermined plan as to how the checkpoint would operate?

[TROOPER CARROLL]:  We did.

[THE STATE]:  What was that plan?

[TROOPER CARROLL]:  To check all vehicles that passed through, license, registration, insurance violations, any type of violation that [came] through, and to check every vehicle that passed through.

On cross-examination, defense counsel also questioned Trooper Carroll regarding the purpose of the checkpoint:

[DEFENSE COUNSEL]:  So your purpose was to find violations?

[TROOPER CARROLL]:  Motor vehicle violations.

Defense counsel then questioned Trooper Carroll regarding the scope of the checkpoint:

[DEFENSE COUNSEL]:  . . . I'm going to get very specific. The purpose of [the checkpoint] was to encourage people to abide by the law; is that your purpose out there?

[TROOPER CARROLL]:  No. It's to check every license, registration, insurance violation, or any type of motor vehicle violation that [came] through.

[DEFENSE COUNSEL]: Did you limit it to motor vehicle violations?

[TROOPER CARROLL]:  What do you mean?

[DEFENSE COUNSEL]: Were you looking for any criminal violations?

[TROOPER CARROLL]: I was looking for all violations, any violation.

. . . .

[DEFENSE COUNSEL]  This checking station was not tailored to fit some crucial ongoing investigation. This was a generalized checking station?

[TROOPER CARROLL]:  Yes.

. . . .

[DEFENSE COUNSEL]: Were you out there for any specific public safety reason having to do with that road, or was it the generalized—

[TROOPER CARROLL]: Specifically, I was out there to enforce the laws and violations that [came] through the license check, which I think would be to the benefit of the public.

This record reveals that Trooper Carroll's initial explanation of the primary purpose of the checkpoint was that it was designed "[t]o enforce any kind of motor vehicle law violations." Trooper Carroll asserted this purpose multiple times throughout the hearing. On two occasions, however, Trooper Carroll suggested that the checkpoint's purpose was even more broad, including finding any and all criminal violations, even beyond motor vehicle law violations. Further, on other occasions, Trooper Carroll suggested that the checkpoint's primary purpose was limited to checking for drivers' license, registration, and insurance violations, rather than "all criminal violations" or "all motor vehicle violations."

The United States Supreme Court has previously suggested that checking for drivers' license and vehicle registration violations is a lawful primary purpose for a checkpoint. *See, e.g., Edmond,* 531 U.S. at 37-38, 148 L. Ed. 2d at 341; *Prouse,* 440 U.S. at 663, 59 L. Ed. 2d at 673-74. North Carolina Courts have also upheld checkpoints designed to uncover drivers' license and vehicle registration violations. *See, e.g., State v. Mitchell,* 358 N.C. 63, 592 S.E.2d 543 (2004); *State v. Tarlton,* 146 N.C. App. 417, 553 S.E.2d 50 (2001). However, it is also clear that a checkpoint whose primary purpose is to find any and all criminal violations is unlawful, even if police have secondary objectives related to highway safety. *See Edmond,* 531 U.S. at 41-42, 148 L. Ed. 2d at 343 (holding that a primary purpose of uncovering evidence of ordinary criminal activity contravenes the Fourth Amendment). Further, it is unclear whether a primary purpose of finding any and all *motor vehicle* violations is a lawful primary purpose. One reason that a checkpoint is an appropriate tool for helping police discover certain types of motor vehicle violations is that police

cannot discover such violations simply by observing a vehicle during normal road travel. *See, e.g.*, N.C. Gen. Stat. § 20-7(a) (2007) (driver must carry a license while driving a vehicle); N.C. Gen. Stat. § 20-57(c) (2007) (vehicle owner must carry a signed registration card in the vehicle); N.C. Gen. Stat. § 20-313(a) (2007) (vehicle owner must maintain an insurance policy). However, the United States Supreme Court has previously expressed concern with allowing suspicionless stops to enforce motor vehicle violations that are readily observable. *See Prouse*, 440 U.S. at 660, 59 L. Ed. 2d at 671-72. Many violations of North Carolina's motor vehicle laws are readily observable and can be adequately addressed by roving patrols when officers develop individualized suspicion of a certain vehicle. *See, e.g.*, N.C. Gen. Stat. § 20-63(e), (g) (2007) (license plate must be clean and unconcealed); N.C. Gen. Stat. § 20-126(a)-(b) (2007) (vehicle must have an inside rearview mirror and a driver's-side outside mirror); N.C. Gen. Stat. § 20-127(a)-(b) (2007) (vehicle must have a windshield wiper and a non-tinted windshield); N.C. Gen. Stat. § 20-129 (2007) (establishing requirements for headlights and rear lights); N.C. Gen. Stat. § 20-135.2B(a) (2007) (children may not be transported in an open truck bed); N.C. Gen. Stat. § 20-140.2 (2007) (vehicle cannot be overcrowded).

Given these concerns and the variations in Trooper Carroll's testimony, the trial court was required to make findings regarding the actual primary purpose of the checkpoint and it was required to reach a conclusion regarding whether this purpose was lawful. However, in its 26 February 2007 oral findings, the trial court merely found that "[Trooper Carroll] [s]aid the purpose of the checkpoint was to—for license checks, make sure persons were observing the motor vehicle statutes, State of North Carolina." This finding simply recites two of Trooper Carroll's stated purposes for the checkpoint and is not an independent finding regarding the actual primary purpose. Without such a finding, the trial court could not, and indeed did not, issue a conclusion regarding whether the primary purpose of the checkpoint was lawful. *See, e.g.*, *State v. Lang*, 309 N.C. 512, 520, 308 S.E.2d 317, 321 (1983) (stating that findings of fact that merely recite trial testimony "do not resolve conflicts in the evidence but are merely statements of what a particular witness said. Although such recitations of testimony may properly be included in an order denying suppression, they cannot substitute for findings of fact resolving material conflicts."). Similarly, the findings in the trial court's 19 November 2007 written order simply recite Trooper Carroll's testimony regarding the checkpoint's purpose. The written order contains no independent

finding regarding the primary purpose of the checkpoint, and it contains no conclusion addressing the lawfulness of the primary purpose. We therefore remand this case to the trial court to issue new findings and conclusions regarding the primary programmatic purpose of the checkpoint.

C.

Even if the trial court had determined that the primary programmatic purpose of the checkpoint was lawful, it then was required to apply the three-prong inquiry set out in *Brown* to determine whether the checkpoint itself was reasonable. *Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342.

Under the first *Brown* prong, the trial court was required to assess "the gravity of the public concerns served by the seizure." *Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 362. Both the United States Supreme Court as well as our Courts have suggested that "license and registration checkpoints advance an important purpose[.]" *Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342. The United States Supreme Court has also noted that states have a "vital interest" in ensuring compliance with other types of motor vehicle laws that promote public safety on the roads. *Prouse*, 440 U.S. at 658, 59 L. Ed. 2d at 670-71. However, without determining the primary programmatic purpose of the checkpoint, the trial court could not have adequately assessed the strength of the State's interest in conducting the checkpoint. Indeed, neither the trial court's 26 February 2007 oral findings nor its 19 November 2007 written order specifically addresses the strength of the public interest in the particular checkpoint at issue.

After assessing the public interest, the trial court was required to assess "the degree to which the seizure advance[d] the public interest." *Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 362. In other words, the trial court should have determined whether "[t]he police appropriately tailored their checkpoint stops" to fit their primary purpose. *Lidster*, 540 U.S. at 427, 157 L. Ed. 2d at 852. Our Court has previously identified a number of non-exclusive factors that courts should consider when determining whether a checkpoint is appropriately tailored, including: whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or ending time; and whether police offered any reason why that particular time span was selected. *See Rose*, 170 N.C. App. at 295, 612 S.E.2d at 342-43.

In this case, the trial court made no findings concerning tailoring in its 26 February 2007 oral findings, but did conclude that the checkpoint "was not an unreasonable detention." Without the requisite findings on the second *Brown* prong, the trial court's findings cannot support its conclusion that the checkpoint was reasonable. The trial court did, however, make the following written findings in its 19 November 2007 order:

> 4. The checking station was set up in a safe location, however[,] [Trooper Carroll] was unaware of any specific problems with unlicensed drivers or motor vehicle law violations at this location.

> . . . .

> 22. Trooper Carroll testified that . . . he used his training and experience and exercised his discretion regarding: the location of this checking station, . . . when the checking station should start, [and] how long it should last or when it should end[.]

(Citations omitted.) While the trial court did make certain written findings with respect to tailoring, the written order gives no indication that the trial court balanced these findings against the other *Brown* factors to determine whether the checkpoint was reasonable. The trial court merely concluded "[t]hat Trooper Carroll complied with the requirements for conducting a checking station," and that "[t]he evidence obtained need not be suppressed." These statements alone do not explain why the trial court concluded that the checkpoint was reasonable, especially given that the trial court's written findings on the second *Brown* prong raise concerns regarding whether the checkpoint was tailored to achieve its purported objectives.

Finally, the trial court was required to assess "the severity of the interference with individual liberty" occasioned by the checkpoint. *Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 362. In general, " '[t]he circumstances surrounding a checkpoint stop and search are far less intrusive than those attending a roving-patrol stop.' " *Martinez-Fuerte*, 428 U.S. at 558, 49 L. Ed. 2d at 1128 (quoting *United States v. Ortiz*, 422 U.S. 891, 894, 45 L. Ed. 2d 623, 628 (1975)). However, courts have consistently required restrictions on the discretion of the officers conducting the checkpoint to ensure that the intrusion on individual liberty is no greater than is necessary to achieve the checkpoint's objectives. *See, e.g., Brown*, 443 U.S. at 51, 61 L. Ed. 2d at 362 (stat-

ing that "[a] central concern . . . has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. . . . [T]he seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."); *Prouse*, 440 U.S. at 661, 59 L. Ed. 2d at 672 (stating that "standardless and unconstrained discretion is [an] evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent").

Courts have previously identified a number of non-exclusive factors relevant to officer discretion and individual privacy, including: the checkpoint's potential interference with legitimate traffic, *see Martinez-Fuerte*, 428 U.S. at 559, 49 L. Ed. 2d at 1129; whether police took steps to put drivers on notice of an approaching checkpoint, *see id.*; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field, *see id.*; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern, *see Lidster*, 540 U.S. at 428, 157 L. Ed. 2d at 853; *Sitz*, 496 U.S. at 453, 110 L. Ed. 2d at 422; whether drivers could see visible signs of the officers' authority, *see id.*; whether police operated the checkpoint pursuant to any oral or written guidelines, *see Rose*, 170 N.C. App. at 296, 612 S.E.2d at 344; whether the officers were subject to any form of supervision, *see id.*; and whether the officers received permission from their supervising officer to conduct the checkpoint, *see Mitchell*, 358 N.C. at 68, 592 S.E.2d at 546. Our Court has held that these and other factors are not " 'lynchpin[s],' but instead [are] circumstance[s] to be considered as part of the totality of the circumstances in examining the reasonableness of a checkpoint." *Rose*, 170 N.C. App. at 298, 612 S.E.2d at 345.

In this case, the trial court made oral findings on 26 February 2007 that "[Trooper Carroll] checked with his supervisor and verified that he was going to have a—set up a checkpoint. He's not met with any objection. . . . It was set up in a safe place, systematically done. They chose to stop every vehicle." These findings demonstrate that the trial court did consider some of the relevant factors under the third *Brown* prong. However, given that the trial court did not make adequate findings on the first two *Brown* prongs, the trial court's findings on the third *Brown* prong alone cannot support its oral conclusion that the checkpoint "was not an unreasonable detention."

**STATE v. VEAZEY**

[191 N.C. App. 181 (2008)]

The trial court's 19 November 2007 written findings on the third *Brown* prong differed substantially from its earlier oral findings:

3. Trooper Carroll testified that he did not have to get permission to set up the checking station, however[,] he did think that he called a supervisor to advise the supervisor that he was setting up a checking station.

4. The checking station was set up in a safe location[.] . . .

5. Trooper Carroll relied on his vast training to decide when the traffic flow was too congested[, and] then he would allow cars [to] go by unchecked to allow traffic to move forward, and resume detaining people when he determined it appropriate.

. . . .

7. Trooper Carroll had full discretion over the duration of the stop and the extent of the investigation, and he used his training and experience to determine how to proceed.

. . . .

17. On [c]ross-[e]xamination[,] [Trooper Carroll] testified that he knew of no directives which restricted his activity at the checking station, [and] no supervisor came out to give any direction to the length and scope of the detentions at the checking stations[.] . . .

. . . .

22. Trooper Carroll testified that there were no restrictions placed upon him by any supervisor, but he used his training and experience and exercised his discretion regarding: the location of this checking station, how long the traffic must wait, when the checking station should start, how long it should last or when it should end, when he could stop someone for not entering the checking station even without an infraction of the law, and how many question[s] to ask and how long to detain a person when the person produces a facially valid driver[s'] license.

(Citations omitted.) As noted above, these findings alone cannot support a conclusion that the checkpoint was reasonable because the trial court did not make adequate findings on the first two *Brown* prongs. Further, the trial court's written findings tend to weigh in favor of a conclusion that the checkpoint was an unreasonable detention. The trial court therefore was required to explain why it con-

STATE v. VEAZEY

[191 N.C. App. 181 (2008)]

cluded that, on balance, the public interest in the checkpoint outweighed the intrusion on Defendant's protected liberty interests. The trial court's written order, however, contains no such explanation. Therefore, if the trial court determines on remand that the State's primary purpose for the checkpoint was lawful, it must also issue new findings and conclusions regarding the reasonableness of the checkpoint.

II.

**[2]** Defendant next argues that even if the initial checkpoint stop was constitutional, Trooper Carroll unreasonably detained Defendant by directing him to a secondary checking station. Defendant argues that the trial court erred by admitting evidence gained as a result of this secondary stop. We address Defendant's argument in the event that, on remand, the trial court determines that the initial stop of Defendant at the checkpoint was constitutional.

Defendant argues that if the primary purpose of the checkpoint was to check for a valid driver's license, Defendant should have been allowed to proceed through the checkpoint after he presented a valid driver's license to Trooper Carroll, even though his driver's license was issued in a different state from that in which his vehicle was registered. According to Defendant, Trooper Carroll's decision to further detain Defendant was merely a "fishing expedition" that allowed Trooper Carroll to investigate for evidence of any general criminal activity. Defendant argues that this secondary detention was unreasonable, in violation of the Fourth and Fourteenth Amendments.

While individualized suspicion is not required for police to briefly detain a driver at a lawful checkpoint, any further detention or search must be based on either consent or individualized suspicion of criminal wrongdoing. *Martinez-Fuerte*, 428 U.S. at 567, 49 L. Ed. 2d at 1133-34. In this case, Trooper Carroll testified that when Defendant presented his driver's license during the initial checkpoint detention, Trooper Carroll detected a strong odor of alcohol in the vehicle and also observed that Defendant's eyes were red and glassy. These facts provided a sufficient basis for reasonable suspicion permitting Trooper Carroll to pursue further investigation and detention of Defendant. Defendant's assignment of error is overruled.

Remanded.

Judge GEER concurs.

**ROSSETTO USA, INC. v. GREENSKY FIN., LLC**

[191 N.C. App. 196 (2008)]

Judge STEELMAN concurs in the result with a separate opinion.

STEELMAN, Judge, concurring in the result.

I concur with the holding of the majority remanding this matter for further findings of fact by the trial court.

I am concerned by the substantial discrepancies between the order dictated by the trial judge in open court and the final written order. It is the duty of the trial judge to ensure that a written order accurately reflects his or her rulings before it is signed, and to modify the order if it is not correct. It is also the duty of counsel preparing the order to ensure that it accurately reflects the trial court's findings and rulings.