STATE OF NORTH CAROLINA
v.
ANTHONY BURROUGHS, Defendant
No. COA08-891
Court of Appeals of North Carolina
Filed April 7, 2009
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Kathryne E. Hathcock, for the State.
Tin, Fulton, Walker & Owen, PLLC, by W. Rob Heroy, for defendant-appellant.
WYNN, Judge.
A vehicle stop at a highway checkpoint is constitutionally permissible when it is reasonable. State v. Mitchell, 358 N.C. 63, 66, 592 S.E.2d 543, 545 (2004). Here, the State argues that the highway checkpoint conducted by the Charlotte-Mecklenburg Police Department was constitutionally reasonable and not applied in a racially discriminatory manner. Because the trial court's findings of fact do not support the conclusion that the checkpoint was unconstitutional, we reverse the trial court order suppressing the evidence derived from the checkpoint.
On 27 May 2005 at approximately 12:10 a.m., Defendant Anthony Burroughs drove to a Driving While Impaired (DWI) checkpoint conducted by the Charlotte-Mecklenburg Police Department. Officer Matthew Pressley approached Defendant and "engaged him in conversation by greeting him, asking him how he was doing, and informing him that the officers were conducting a DWI checkpoint." During the stop, Officer Pressley detected a "strong odor" of alcohol on Defendant's breath and observed that his eyes were "glossy and bloodshot." When asked if he'd had anything to drink, Defendant responded that "he had consumed two glasses of wine." Officer Pressley asked Defendant to exit the vehicle and performed additional screening tests. Thereafter, Officer Pressley placed Defendant under arrest for DWI.
On 8 December 2005, Defendant was convicted of DWI in district court and gave notice of appeal to the superior court, where he moved to suppress evidence derived from the checkpoint stop of his motor vehicle. Following a hearing, the trial court granted Defendant's motion to suppress. Thereafter, the State appealed and this Court reversed the trial court's order to suppress and remanded the case for additional "findings of fact as to the constitutionality of the individual stop of defendant." State v. Burroughs, 185 N.C. App. 496, 503, 648 S.E.2d 561, 566 (2007). On remand, the trial court heard additional testimony and again ordered the suppression of the evidence against Defendant.
Appealing again to this Court, the State argues that the trial court erred in granting Defendant's motion to suppress because: (I) the stop of Defendant constituted a reasonable search pursuant to the Fourth Amendment; and (II) the checkpoint was not applied in a racially discriminatory manner. We agree.

I.
Our courts have "well established that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." City of Indianapolis v. Edmond, 531 U.S. 32, 40, 148 L. Ed. 2d 333, 342 (2000). However, a checkpoint stop is only permissible under the Fourth Amendment and the N.C. Constitution when it is reasonable. See, e.g., Mitchell, 358 N.C. at 66, 592 S.E.2d at 545. In determining whether a checkpoint meets the constitutional requirements for reasonableness, "the court must determine the primary programmatic purpose of the checkpoint." State v. Veazey, ___ N.C. App. ___, 662 S.E.2d 683, 686 (2008) (citation omitted). "[I]f a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint, . . . [the court] `must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances.'" Veazey, ___ N.C. App. at ___, 662 S.E.2d at 686-87 (quoting Illinois v. Lidster, 540 U.S. 419, 426, 157 L. Ed. 2d 843, 852 (2004)).
In the first appeal of this matter, this Court concluded that the primary programmatic purpose for the checkpoint in this case was a legitimate, constitutional purpose: "To check for sobriety." Burroughs, 185 N.C. App. at 503, 648 S.E.2d at 566. Thus, the issue on appeal is whether the trial court's conclusion that the checkpoint was "not whatsoever reasonable based upon the individual circumstances of the stop" is supported by its findings of fact. To determine whether a checkpoint stop was reasonable, the court must weigh "[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty." Brown v. Texas, 443 U.S. 47, 51, 61 L. Ed. 2d 357, 362 (1979) (citations omitted). Since the parties stipulated that the public interest in detaining impaired motorists is grave, we assess the trial court's conclusion based on the remaining two prongs.
In evaluating the degree to which a checkpoint stop advances the public interest, a trial court should consider the following non-exclusive factors: "whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or ending time; and whether police offered any reason why that particular time span was selected." Veazey, ___ N.C. App. at ___, 662 S.E.2d at 690 (internal citations omitted).
In this case, the trial court made the following findings:
3. That approximately a week or two prior to May 26, 2005, Officer Pressley was made aware by Sgt. Shepegrell that a DWI checkpoint would be set up on the evening of May 26,2005, into the morning of May 27, 2005, with the time parameters of 11:00 p.m. to 3:00 a.m.
4. That on May 26, 2005, at approximately 10:30 p.m. at least a dozen Charlotte-Mecklenburg police officers, including Officer Pressley, met at roll call with their supervising officers regarding the checkpoint, received a copy of the checkpoint plan and then proceeded to the checkpoint location.
Additionally, the checkpoint plan, introduced as State's Exhibit Number 1, listed the following as considerations made by the police department in choosing the location and time for the checkpoint:
1. Park Road is a thoroughfare for drivers leaving the downtown entertainment district .
. . .
3. Several establishments on and around Park Road serve alcoholic beverages, and are open through the time of the checkpoint.
4. Numerous crashes investigated in [sic] around Park Road during the time of the check point have had alcohol as a contributing factor to the crash.
5. Routine traffic enforcement along Park Road has resulted in numerous DWI charges .
The plan also stated that the road has a "[g]ood-long line of sight" and is in a "[w]ell lit area, with a substantial public vehicular area for further investigation of drivers."
Moreover, the findings and evidence show that the checkpoint was planned well in advance and supervised by Sergeant Shepegrell. The officers who conducted the checkpoint were trained in the appropriate protocol for interfacing with drivers, and received a copy of the checkpoint plan. Further, the checkpoint plan indicates that the officers considered the amount of traffic, past incidents of DWI and alcohol-related accidents, safety concerns, and the proximity to bars and the entertainment district in choosing the location for the checkpoint. Thus, contrary to the trial court's ultimate determination, these findings support the conclusion that the checkpoint was appropriately tailored to monitoring motorists' sobriety. The third prong in determining whether a checkpoint was reasonable requires the trial court to weigh the severity of the checkpoint's inference with motorists' liberty, and evaluate the amount of discretion given to officers conducting the checkpoint. The U.S. Supreme Court has held that a checkpoint "must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Brown, 443 U.S. at 51, 61 L. Ed. 2d at 362. Further, the following non-exhaustive factors should be considered:
the checkpoint's potential interference with legitimate traffic; whether police took steps to put drivers on notice of an approaching checkpoint; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern; whether drivers could see visible signs of the officers' authority; whether police operated the checkpoint pursuant to any oral or written guidelines; whether the officers were subject to any form of supervision; and whether the officers received permission from their supervising officer to conduct the checkpoint.
Veazey, ___ N.C. App. at ___, 662 S.E.2d. at 691 (internal citations omitted).
Here, the trial court made the following additional findings:
8. That in the section entitled Strategic Rules For This Checkpoint it is stated,inter alia, "3. EVERY VEHICLE is to be stopped." This paragraph then goes on to state that the only exception to this rule is when traffic conditions become hazardous or would create an unreasonable delay to the public and ends with the statement "NO other variation from the pattern is allowed." and 4. "The officer stopping a vehicle in every case shall perform only the following screening: A. Request the driver produce a driver's license.
B. Observe the driver's eyes for signs of impairment.
C. Engage the driver in conversation for signs of impairment.
D. Observe the driver's clothing .
. . .
9. That Officer Pressley stated on direct examination that no officer was allowed to deviate from the written plan.
10. That Officer Pressley stated that during the time he was there he did not observe a car come through the checking station without being stopped.
Based on these findings, the discretion of the officers conducting the checkpoint was sufficiently limited. The checkpoint was devised by Sergeant Shepegrell, the officers conducting the checkpoint were given specific oral and written instructions about how to conduct the checkpoint, and "no officer was allowed to deviate from the written plan." The checkpoint established a systematic screening procedure in which each officer was instructed to do four things: request the driver produce a driver's license, observe the driver's eyes, engage the driver in conversation, and observe the driver's clothing. Further, Officer Pressley, who conducted Defendant's stop, strictly complied with the procedure as set out in the plan.
Accordingly, we hold the trial court's findings do not support the conclusion that the checkpoint was unconstitutional under the Fourth Amendment or Article I, Section 20 of the N.C. Constitution.

II.
The State also argues that the trial court erred in concluding that the checkpoint was applied in a racially discriminatory manner. The record and findings of fact show that Chris Miller, a white male, was treated differently at the same checkpoint than Defendant, a black male. However, the evidence fails to establish a discriminatory purpose, and thus the trial court's conclusion that the checkpoint was applied in a racially discriminatory manner was in error.
The Equal Protection Clause and the N.C. Constitution recognize the right to equal protection under the laws, including protection against racial discrimination. U.S. Const. Amend. 14; N.C. Const. art. I, § 19. To prevail on a claim of selective prosecution based on race, "a defendant must show more than simply that discretion has been exercised in the application of a law resulting in unequal treatment among individuals; he must show that in the exercise of that discretion there has been intentional or deliberate discrimination by design." In re Register, 84 N.C. App. 336, 341, 352 S.E.2d 889, 892 (1987) (citations omitted). In short, a defendant must demonstrate that the action was taken (1) with a discriminatory purpose and (2) had a discriminatory effect. State v. Garner, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995), cert. denied, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996).
Here, the trial court concluded "[t]hat the checkpoint plan was applied in a racially discriminatory manner based upon the fact that all four screening tests required by the plan were performed on [Defendant], a black male; and that the four tests were not performed upon Mr. Miller, a white male in the next car to approach the checkpoint." Evidence in the record shows that Defendant and Mr. Miller consumed alcoholic beverages together at a local tavern and approached the same checkpoint on the same night at approximately the same time; "Mr. Miller was not asked any questions nor engaged in any conversation" by the officer who conducted the stop, while the Defendant was subject to the full four-part inquiry by Officer Pressley as mandated by the checkpoint plan; and the only other person arrested during the checkpoint was a black male.
While these findings may be sufficient to raise a suspicion about the manner in which the checkpoint was conducted, the evidence presented at the hearing was not sufficient to establish intentional racial discrimination against Defendant. Accordingly, we hold that the trial court erred in concluding that the checkpoint was applied in a racially discriminatory manner.
In sum, we hold that the trial court erred in granting Defendant's motion to suppress and remand the case for trial. Reversed and remanded.
Judges ROBERT C. HUNTER and ERVIN concur.
Report per Rule 30(e).