STATE OF NORTH CAROLINA v. ANDREW WILLIAM JARRETT

No. COA09-1036

(Filed 4 May 2010)

**Motor Vehicles— driving while impaired—driver's license checkpoint—motion to suppress evidence—reasonable articulable suspicion**

The trial court did not err in a driving while impaired case by denying defendant's motion to suppress evidence obtained from his car during a driver's license checkpoint. The primary programmatic purpose of the checkpoint was lawful and reasonable. Under the totality of circumstances, the officer had reasonable articulable suspicion to detain defendant regarding the contents of an aluminum can after it was determined to contain an alcoholic beverage.

Appeal by defendant from order entered 17 February 2009 by Judge Edgar B. Gregory in Forsyth County Superior Court. Heard in the Court of Appeals 11 February 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Sebastian Kielmanovich, for the State.*

*William L. Gardo, II, for defendant-appellant.*

CALABRIA, Judge.

Andrew William Jarrett ("defendant") appeals the trial court's order denying his motion to suppress evidence. We affirm.

## I. Background

During the evening of 28 March 2008, the Forsyth County Sheriff's Department ("Sheriff's Department") conducted a stationary driver's license checkpoint ("the checkpoint") at the intersection of Styers Ferry Road and Dull Road in Forsyth County, North Carolina. The checkpoint was conducted pursuant to a written Sheriff's Department policy. Six officers with flashlights, two in each lane of traffic, stopped every car coming through the checkpoint to determine if the drivers possessed a valid driver's license and vehicle registration. Corporal Barry Sales was present at the checkpoint and supervised the officers. All officers at the checkpoint wore uniforms and traffic vests. Additionally, the Sheriff's Department vehicles at the checkpoint had activated their blue lights.

At approximately 11:16 p.m., defendant, accompanied by a passenger, approached the checkpoint driving his 1990 Honda Accord ("the Accord"). As Deputy T.L. McMasters ("Deputy McMasters") approached the driver's side of the Accord to request defendant's license and registration, he noticed an aluminum can located between the driver's seat and the passenger's seat. The can was open and a light liquid residue was evident on the top of the can. Deputy McMasters then observed the passenger leaning over toward defendant. It appeared to Deputy McMasters that the passenger was trying to conceal the can from view.

Defendant provided Deputy McMasters with a valid license and registration. The license indicated that defendant was eighteen years old. Before returning defendant's documentation, Deputy McMasters asked the occupants of the Accord, "What is in the can?" Neither defendant nor the passenger answered the question. When Deputy McMasters asked again, the passenger responded by raising the can, revealing that it was a Busch Ice beer.

Deputy McMasters directed defendant to drive the Accord to a nearby Citgo gas station parking lot. Deputy McMasters then told defendant to exit the Accord. Upon exiting, defendant admitted he had been drinking. Deputy McMasters then performed a series of field sobriety tests, which defendant failed. As a result, defendant was arrested and charged with driving while impaired ("DWI") and driving by a person less than twenty-one years old after consuming alcohol.

On 25 June 2008, in Forsyth County District Court, defendant filed a motion to suppress the evidence obtained at the checkpoint. After the trial court denied the motion, defendant pled guilty to both charges. Defendant then timely filed a notice of appeal for his DWI conviction to superior court.[1]

On 22 January 2009, defendant filed another motion to suppress the evidence obtained at the checkpoint, this time in Forsyth County Superior Court. On 6 February 2009, a suppression hearing was held. Deputy McMasters was the only witness to testify at the suppression hearing. On 17 February 2009, the trial court denied defendant's motion to suppress. Defendant then pled guilty to DWI on 6 April 2009, but reserved his right to appeal the denial of the motion to suppress. Defendant was sentenced to sixty days in the Forsyth County Jail. The active sentence was suspended and defendant was placed on supervised probation for twelve months. Defendant appeals.

---

1. The district court arrested judgment on the conviction for driving by a person less than twenty-one years old after consuming alcohol.

## II. Standard of Review

Defendant's sole argument on appeal is that the trial court erred in denying his motion to suppress. "When reviewing a motion to suppress evidence, this Court determines whether the trial court's findings of fact are supported by competent evidence and whether the findings of fact support the conclusions of law. If supported by competent evidence, the trial court's findings of fact are conclusive on appeal, even if conflicting evidence was also introduced. However, conclusions of law regarding admissibility are reviewed de novo." *State v. Wilkerson*, 363 N.C. 382, 433-34, 683 S.E.2d 174, 205 (2009) (internal citations omitted).

## III. Constitutionality of the Checkpoint

Defendant argues that the trial court erred by concluding that the checkpoint did not violate defendant's Fourth Amendment rights. We disagree.

" '[P]olice officers effectuate a seizure when they stop a vehicle at a checkpoint.' As with all seizures, checkpoints conform with the Fourth Amendment only 'if they are reasonable.' " *State v. Rose*, 170 N.C. App. 284, 288, 612 S.E.2d 336, 339 (2005) (quoting *State v. Mitchell*, 358 N.C. 63, 66, 592 S.E.2d 543, 545 (2004)). Thus, "police may briefly detain vehicles at a roadblock checkpoint without individualized suspicion, so long as the purpose of the checkpoint is legitimate and the checkpoint itself is reasonable." *State v. Veazey*, 191 N.C. App. 181, 184, 662 S.E.2d 683, 686 (2008) (citations omitted).

> When considering a challenge to a checkpoint, the reviewing court must undertake a two-part inquiry to determine whether the checkpoint meets constitutional requirements. First, the court must determine the primary programmatic purpose of the checkpoint. . . . Second, if a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint . . . [the court] must judge its reasonableness, hence, its constitutionality, on the basis of the individual circumstances.

*Id.* at 185-86, 662 S.E.2d at 686-87 (internal quotations and citations omitted).

### A. Primary programmatic purpose

"In considering the constitutionality of a checkpoint, the trial court must initially 'examine the available evidence to determine the purpose of the checkpoint program.' " *State v. Gabriel*, 192 N.C. App.

517, 521, 665 S.E.2d 581, 585 (2008) (quoting *Rose*, 170 N.C. App. at 289, 612 S.E.2d at 339).

> Our Court has previously held that where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose. However, where there is evidence in the record that could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose. In such cases, the trial court may not simply accept the State's invocation of a proper purpose, but instead must carr[y] out a close review of the scheme at issue. This type of searching inquiry is necessary to ensure that an illegal multi-purpose checkpoint [is not] made legal by the simple device of assigning the primary purpose to one objective instead of the other[.]

*Veazey*, 191 N.C. App. at 187, 662 S.E.2d at 687-88 (internal quotations and citations omitted). "[W]hen a trooper's testimony varies concerning the primary purpose of the checkpoint, the trial court is 'required to make findings regarding the actual primary purpose of the checkpoint and . . . to reach a conclusion regarding whether this purpose was lawful.' " *Gabriel*, 192 N.C. App. at 521, 665 S.E.2d at 585 (quoting *Veazey*, 191 N.C. App. at 190, 662 S.E.2d at 689).

In the instant case, Deputy McMasters testified that the purpose of the checkpoint was to "[c]heck the license and registration of every car coming through the checkpoint." However, on cross-examination, Deputy McMasters also admitted that officers at the checkpoint were looking for "evidence that's in plain view of other crimes" and "[a]ny sign of a criminal activity." Additionally, Deputy McMasters testified that the location of the checkpoint was chosen in part because drivers in that area who "don't have a license or . . . [ha]ve been drinking or . . . want to get somewhere quickly and speed . . ." would be likely to be traveling in the area of the checkpoint. Because variations existed in Deputy McMasters' testimony regarding the primary purpose of the checkpoint, the trial court was required to make findings regarding the actual primary purpose of the checkpoint.

In the order denying defendant's motion to suppress, the trial court found as fact, supported by Deputy McMasters' testimony, that the checkpoint was conducted according to a policy promulgated by the Sheriff's Department. Specifically, the trial court found that, in

order to comply with the policy, (1) a supervising officer was present; (2) all cars coming through the checkpoint were stopped; and (3) the blue lights were activated on all Sheriff's Department vehicles. As a result of these findings, the trial court concluded that "the primary purpose of the checkpoint was to determine if drivers were comply-ing with the driver's license laws of North Carolina and to deter citi-zens from violating these said laws."

"The United States Supreme Court has previously suggested that checking for drivers' license and vehicle registration violations is a lawful primary purpose for a checkpoint. North Carolina Courts have also upheld checkpoints designed to uncover drivers' license and vehicle registration violations." *Veazey*, 191 N.C. App. at 189, 662 S.E.2d at 689 (citations omitted). Therefore, the primary program-matic purpose of the checkpoint, as determined by the trial court, was a lawful one.

B. Reasonableness

Although the trial court concluded that the checkpoint had a law-ful primary purpose, "its inquiry does not end with that finding." *Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342. Instead, the trial court must still determine "whether the checkpoint itself was reasonable." *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 689-90.

"To determine whether a seizure at a checkpoint is reasonable requires a balancing of the public's interest and an individual's privacy interest." *Rose*, 170 N.C. App. at 293, 612 S.E.2d at 342. In order to make this determination, this Court has required applica-tion of the three-prong test set out by the United States Supreme Court in *Brown v. Texas*, 443 U.S. 47, 50, 61 L. Ed. 2d 357, 361, 99 S. Ct. 2637, 2640 (1979). *Id.* at 293, 612 S.E.2d at 342. Under *Brown*, the trial court must consider "[1] the gravity of the public concerns served by the seizure[;] [2] the degree to which the seizure advances the public interest[;] and [3] the severity of the interference with indi-vidual liberty." *Id.* at 293-94, 612 S.E.2d at 342 (internal quotations and citation omitted).

i The gravity of the public concerns

"The first *Brown* factor—the gravity of the public concerns served by the seizure—analyzes the importance of the purpose of the checkpoint. This factor is addressed by first identifying the primary programmatic purpose . . . and then assessing the importance of the particular stop to the public." *Id.* at 294, 612 S.E.2d at 342. As previ-

ously noted, the trial court determined that the primary purpose of the checkpoint was to uncover and deter driver's license violations. The trial court then concluded that "the deterrence goal was a reasonable one."

> Both the United States Supreme Court as well as our Courts have suggested that license and registration checkpoints advance an important purpose. The United States Supreme Court has also noted that states have a vital interest in ensuring compliance with other types of motor vehicle laws that promote public safety on the roads.

*Veazey,* 191 N.C. App. at 191, 662 S.E.2d at 690 (internal quotations and citations omitted). Therefore, the checkpoint adequately satisfied the requirements of the first prong of *Brown.*

### ii. The degree to which the seizure advanced public interests

Under the second *Brown* prong—the degree to which the seizure advanced public interests—the trial court was required to determine "whether '[t]he police appropriately tailored their checkpoint stops' to fit their primary purpose." *Veazey,* 191 N.C. App. at 191, 662 S.E.2d at 690 (quoting *Illinois v. Lidster,* 540 U.S. 419, 427, 157 L. Ed. 2d 843, 852, 124 S. Ct. 885, 891 (2004)).

> Our Court has previously identified a number of non-exclusive factors that courts should consider when determining whether a checkpoint is appropriately tailored, including: whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or ending time; and whether police offered any reason why that particular time span was selected.

*Id.*

In the instant case, the trial court's order found as fact, supported by Deputy McMasters' testimony, that the checkpoint "is conducted 'every Friday and Saturday nights,' " and that "[t]hese checkpoints did result in charges for license violations as well as DWI arrests." Additionally, the trial court found that the checkpoint operated for a period of time between one and one-half to two hours. While these findings do not necessarily address all of the non-exclusive factors suggested by *Veazey,* they do indicate that the trial court considered

appropriate factors to determine whether the checkpoint was sufficiently tailored to fit its primary purpose, satisfying the second *Brown* prong.

### iii. The severity of the interference with individual liberty

The final *Brown* factor to be considered is the severity of the interference with individual liberty. "[C]ourts have consistently required restrictions on the discretion of the officers conducting the checkpoint to ensure that the intrusion on individual liberty is no greater than is necessary to achieve the checkpoint's objectives." *Veazey*, 191 N.C. App. at 192, 662 S.E.2d at 690-91.

> Courts have previously identified a number of non-exclusive factors relevant to officer discretion and individual privacy, including: the checkpoint's potential interference with legitimate traffic; whether police took steps to put drivers on notice of an approaching checkpoint; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern; whether drivers could see visible signs of the officers' authority; whether police operated the checkpoint pursuant to any oral or written guidelines; whether the officers were subject to any form of supervision; and whether the officers received permission from their supervising officer to conduct the checkpoint[.]

*Id.* at 193, 662 S.E.2d at 691. "Our Court has held that these and other factors are not '"lynchpin[s]," but instead [are] circumstance[s] to be considered as part of the totality of the circumstances in examining the reasonableness of a checkpoint.' " *Id.* (quoting *Rose*, 170 N.C. App. at 298, 612 S.E.2d at 345).

In the instant case, the trial court's findings, which were supported by Deputy McMasters' testimony, indicate that it considered some of the relevant factors under the third *Brown* prong. These findings included: (1) "the Sheriff cars had to have their blue lights on;" (2) "[t]he deputies were wearing the uniforms . . . [and] had a visibility of about 200 feet;" (3) "[a]ll cars that came through the license checkpoint from both directions were being stopped;" (4) "[a] supervisor of the Sheriff's Department had to be present on the scene of the license checkpoint;" and (5) "[t]his driver's license checkpoint was established and conducted pursuant to a written Predetermined Forsyth County Sheriff's Office Policy." These findings indicate the

trial court adequately considered the appropriate factors under the third prong of *Brown.*

The trial court's order denying defendant's motion to suppress contained adequate findings of fact, supported by competent evidence, to satisfy the three prongs of the *Brown* test. These findings in turn support the trial court's conclusions of law that "the license check was not an unreasonable detention and therefore was valid under the Fourth Amendment" and "said checkpoint was not unreasonably restrictive on the citizens." The trial court correctly determined that the Sheriff's Department had a legitimate primary programmatic purpose for conducting a checkpoint and that the checkpoint was reasonable under the circumstances. This assignment of error is overruled.

### IV. Constitutionality of the Extended Seizure

Defendant argues that, even if the checkpoint was constitutional, the trial court erred in denying the motion to suppress because Deputy McMasters lacked reasonable, articulable suspicion to detain defendant after a valid license and registration was produced. We disagree.

The United States Supreme Court has held that "police officers [may] act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." *City of Indianapolis v. Edmond*, 531 U.S. 32, 48, 148 L. Ed. 2d 333, 347, 121 S. Ct. 447, 457 (2000). However,

[o]nce the original purpose of the stop has been addressed, in order to justify further delay, there must be grounds which provide the detaining officer with additional reasonable and articulable suspicion or the encounter must have become consensual. Where no grounds for a reasonable and articulable suspicion exist and where the encounter has not become consensual, a detainee's extended seizure is unconstitutional.

*State v. Jackson*, —— N.C. App. ——, ——, 681 S.E.2d 492, 496 (2009) (internal citation omitted).

In the instant case, the primary purpose of the checkpoint was "to determine if drivers were complying with the driver's license laws of North Carolina. . . ." Therefore, the primary purpose of the stop was addressed when defendant produced a valid North Carolina driver's

license and registration for Deputy McMasters. Accordingly, further delay of defendant by Deputy McMasters could only be constitutionally justified if either Deputy McMasters had formed reasonable and articulable suspicion that a crime was being committed or defendant consented to questioning. The State and defendant agree that no consent was given, but disagree as to whether Deputy McMasters possessed reasonable and articulable suspicion to justify further detention of defendant.

> [W]hen an officer observes conduct which leads him reasonably to believe that criminal conduct may be afoot, he may stop the suspicious person to make reasonable inquiries. [T]he police officer must be able to point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant [the] intrusion.

*State v. Foreman*, 351 N.C. 627, 630, 527 S.E.2d 921, 923 (2000) (internal quotations and citations omitted). "The reasonable and articulable suspicion standard requires that the court examine both the articulable facts known to the officers at the time they determined to approach and investigate the activities of [defendant], and the rational inferences which the officers were entitled to draw from those facts." *State v. Butler*, 147 N.C. App. 1, 7, 556 S.E.2d 304, 308 (2001) (internal quotations and citation omitted). "To determine whether the officer had reasonable suspicion, it is necessary to look at the totality of the circumstances." *State v. Myles*, 188 N.C. App. 42, 45, 654 S.E.2d 752, 754, *aff'd per curiam*, 362 N.C. 344, 661 S.E.2d 732 (2008).

In the instant case, the trial court's findings indicate that when Deputy McMasters, who had seven years of law enforcement experience, approached the Accord, he saw an aluminum can located between the driver's seat and the passenger's seat. Additionally, Deputy McMasters witnessed the passenger leaning over toward defendant in an attempt to conceal the can. Based on these observations, Deputy McMasters twice asked the occupants of the Accord, "What is in the can?" At that point, the passenger raised the can, revealing that it was a Busch Ice beer. Deputy McMasters then ordered defendant, whom he knew to be eighteen years old, to drive to the parking lot near the Citgo station. After exiting the Accord, defendant admitted he had consumed alcohol.

We hold, under the totality of the circumstances, that Deputy McMasters possessed reasonable and articulable suspicion that criminal activity was afoot to further delay defendant by questioning him

and his passenger about the contents of the aluminum can. While it is true, as defendant suggests, that the can could have contained any liquid, alcoholic or otherwise, Deputy McMasters only made a reasonable inquiry in order to determine the actual contents of the can. Once it was determined that the can was an alcoholic beverage, Deputy McMasters was justified in ordering defendant aside to conduct further inquiries. When, in response to these inquiries, defendant admitted he had been drinking, Deputy McMasters was justified in placing him under arrest. This assignment of error is overruled.

## V. Conclusion

The trial court's findings of fact were based upon competent evidence and supported the conclusion of law that the checkpoint, conducted by the Sheriff's Department on 28 March 2008, did not violate defendant's Fourth Amendment rights. Further, the trial court's findings fully supported its conclusion of law that Deputy McMasters possessed reasonable and articulable suspicion to further delay, question and ultimately arrest defendant.

Affirmed.

Judges GEER and STEPHENS concur.