An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1369

NORTH CAROLINA COURT OF APPEALS

Filed: 31 December 2014

STATE OF NORTH CAROLINA

v.

VICTORIA GUTIERREZ TSILIMOS,
        Defendant.

Mecklenburg County
No. 10 CRS 242533

Appeal by defendant from judgment entered 31 May 2013 by Judge Richard L. Doughton in Mecklenburg County Superior Court. Heard in the Court of Appeals 23 April 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Kathryne E. Hathcock, for the State.*
>
> *Arnold & Smith, PLLC, by Laura M. Cobb, for defendant-appellant.*

GEER, Judge.

Defendant Victoria Gutierrez Tsilimos appeals from her conviction of driving while impaired. On appeal, defendant contends that the trial court erred in denying her motion to suppress evidence obtained during a checkpoint stop. She challenges the trial court's finding that the primary programmatic purpose of the stop was DWI detection and argues

that the checkpoint was not tailored to address the stated purpose and was, therefore, unreasonable. In support of this contention, defendant argues that the supervising Sergeant's testimony that the location and timing of the checkpoint was chosen due to a high rate of DWI arrests and accidents was not corroborated by documented statistics. This argument addresses only the credibility of and the weight that should be given to the Sergeant's testimony -- questions that are solely within the domain of the trial court. Because the trial court's findings are supported by competent evidence and those findings support the court's conclusion that the primary programmatic purpose of the checkpoint was proper and the checkpoint was reasonable, we hold that the trial court did not err in denying defendant's motion to suppress. We find defendant's remaining arguments also unpersuasive and, therefore, hold that defendant received a trial free from prejudicial error.

## Facts

The State's evidence tended to show the following facts. Beginning at 11:00 p.m. on 2 September 2010, the Charlotte-Mecklenburg Police Department ("CMPD") conducted a checkpoint at the intersection of 5th Street and Caldwell Street and the intersection of 7th Street and Caldwell Street near downtown Charlotte, North Carolina. Marked patrol cars and orange

reflective signs were posted in both directions of travel at each checkpoint location to warn approaching motorists of the upcoming checkpoint. All officers wore police uniforms and reflective traffic vests.

The purpose of the checkpoint was DWI detection. Sergeant David Sloan of the CMPD was the supervisor of the checkpoint and had selected the location in advance. Sergeant Sloan chose the location because there are close to 100 bars and drinking establishments in the area and because several impaired driving related crashes and numerous DWI arrests had occurred in that area on Thursday, Friday, and Saturday nights. Additionally, the CMPD had conducted four other checkpoints in the same location during the previous three to four years, which had resulted in double digit DWI arrests.

Pursuant to the checkpoint plan, officers were directed to stop each vehicle, engage the driver in conversation, ask for a driver's license, and look for signs of impairment. In the event of an emergency or when traffic became severely congested, only Sergeant Sloan was authorized to deviate from the directive to stop every vehicle. Before the checkpoint began, Sergeant Sloan briefed the 37 participating officers on the plan for the checkpoint and provided each of them with a written copy of the plan.

At around 2:30 a.m., Officer Charles G. Jamieson of the CMPD stopped defendant's vehicle. He smelled a very strong odor of alcohol coming from defendant and observed that her eyes were red and watery. When asked, defendant admitted that she had been drinking before operating the vehicle. Officer Jamieson asked defendant to step out of her vehicle, and he performed a series of field sobriety tests. Based upon her performance on the tests, as well as the results of a portable breath test, Officer Jamieson believed that she had consumed a sufficient quantity of alcohol to be impaired.

Officer Jamieson arrested defendant and took her to a portable processing unit called the "BAT mobile," which was a bus containing an EC/IR II intoxilyzer. At 2:53 a.m., Officer Jamieson read defendant her chemical analysis rights and provided her with a written copy of her rights. Defendant did not exercise her right to contact an attorney or a witness to view the testing procedure. At 3:08 a.m., defendant submitted to a breath test and registered a .08 alcohol concentration.

On 8 February 2011, the district court found defendant guilty of impaired driving. Defendant appealed to superior court where she filed a motion to suppress. On 29 May 2013, after a hearing, the trial court entered an order denying the motion. Defendant's case was tried before a jury on 30 and 31

May 2013. On 31 May 2013, the jury returned a verdict of guilty of driving while impaired, and the defendant was sentenced to a presumptive-range term of six months imprisonment. The trial court suspended defendant's sentence and placed her on supervised probation for 24 months. Defendant timely appealed to this Court.

## I

Defendant first argues that the trial court erred in denying her motion to suppress because the checkpoint constituted an unconstitutional seizure. Our review of a trial court's denial of a motion to suppress is limited to "whether the trial court's findings of fact are supported by competent evidence, and whether these findings of fact support the court's conclusions of law." *State v. Pulliam*, 139 N.C. App. 437, 439-40, 533 S.E.2d 280, 282 (2000). "The trial court's conclusions of law . . . are fully reviewable on appeal." *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

It is well established that

> "[w]hen considering a challenge to a checkpoint, the reviewing court must undertake a two-part inquiry to determine whether the checkpoint meets constitutional requirements. First, the court must determine the primary programmatic purpose of the checkpoint. . . . Second, if a court finds that police had a legitimate primary programmatic purpose for conducting a checkpoint . . . [the court] must judge its

reasonableness, hence, its constitutionality, on the basis of the individual circumstances."

*State v. Jarrett*, 203 N.C. App. 675, 677, 692 S.E.2d 420, 423 (2010) (quoting *State v. Veazey*, 191 N.C. App. 181, 185-86, 662 S.E.2d 683, 686-87 (2008)).

Defendant argues that the trial court erred in concluding that the primary programmatic purpose of the checkpoint was the detection of impaired driving. In support of this conclusion, the trial court found, in pertinent part, that:

> 3. Sgt. David B. Sloan testified that he was the supervising officer on scene and he developed the written checkpoint plan (State's Exhibit #1) for the evening. This location was chosen several weeks before the checkpoint was conducted[.]

> 4. Sgt. Sloan testified that the purpose of the checkpoint was DWI detection.

> . . . .

> 7. Sgt. Sloan testified that the location was chosen due to the high vehicle crash rate, and high number of DWI arrests in that immediate area. There are also over 100 restaurants and bars in that area.

> 8. Sgt. Sloan testified that this area had previously been used for checkpoints approximately four times with double digit DWI arrests per checkpoint.

Defendant argues that findings 7 and 8 are not supported by competent evidence because Sergeant Sloan's testimony was based

only on his personal knowledge and is not corroborated by documentary statistical evidence. Defendant points to CMPD crime statistics reports submitted into evidence during Sergeant Sloan's cross-examination that listed only three DWIs in the vicinity of the checkpoint in the year prior to the checkpoint.

Defendant cites no authority, and we have found none, requiring an officer to corroborate his testimony with documentary statistical evidence. This Court has, in fact, held that comparable testimony based on personal knowledge and experience as a police officer constitutes competent evidence of a checkpoint's programmatic purpose. *See State v. Dippel*, ___ N.C. App ___, ___ S.E.2d. ___, 2014 N.C. App. LEXIS 1260, *10, 2014 WL 6907567, *4 (2014) (unpublished) (holding Sergeant's testimony that he chose DWI checkpoint location based on his personal knowledge of prior DWI arrests and crashes in area constituted competent evidence in support of trial court's finding that primary programmatic purpose of checkpoint was DWI detection).

Further, Sergeant Sloan explained that the CMPD reports included only incidents reported by 911 dispatch and by calls for service -- the reports did not include officer-generated arrests. Therefore, Sergeant Sloan explained, the reports were not an accurate representation of the total number of DWI

arrests. To the extent that the documentary statistical evidence conflicted with Sergeant Sloan's testimony regarding the frequency of DWI arrests and vehicle crashes in the checkpoint area, it is well settled that "[i]f there is a conflict between the state's evidence and defendant's evidence on material facts, it is the duty of the trial court to resolve the conflict and such resolution will not be disturbed on appeal." *State v. Chamberlain*, 307 N.C. 130, 143, 297 S.E.2d 540, 548 (1982). Here, Sergeant Sloan's failure to produce supporting statistical documents presented a question of the weight and credibility to be given his testimony, which was solely for the trial court to determine.

Next, defendant argues that this case is materially indistinguishable from *State v. Rose*, 170 N.C. App. 284, 612 S.E.2d 336 (2005). In *Rose*, this Court held that the trial court erred in accepting at face value the officers' stated purpose of a checkpoint stop without conducting a closer review of all the evidence presented. *Id.* at 289, 612 S.E.2d at 340. Defendant asserts that "[t]he only thing that distinguishes this case from *Rose* is the identity of the officer who testified regarding the primary purpose -- a supervisor as opposed to 'individual officers acting at the scene.'" (Quoting *id.* at 290, 612 S.E.2d at 340.) We disagree.

Defendant misconstrues the holding in *Rose*. In *Rose*, although the officers at the checkpoint testified that the purpose of the stop was to check licenses and registrations, the officers also testified that the checkpoint was spontaneous, and no plan had been created ahead of time. *Id.* at 291, 612 S.E.2d at 341. In addition, there was no evidence presented as to why the specific location for the checkpoint was chosen or if that area had a problem with unlicensed or unregistered drivers. *Id.* at 294, 612 S.E.2d at 342-43. Additionally, four of the five officers involved in the checkpoint were narcotics detectives, and the defendant had been arrested for possession of drugs and a weapon and not for a faulty license or registration. *Id.* at 285, 290, 612 S.E.2d at 338, 340. In conducting the checkpoint, one officer would check the drivers' licenses and registrations while a second officer would "scan the inside of the vehicle and walk around it." *Id.* at 292, 612 S.E.2d at 341. This Court noted that this evidence suggested that "the function of the second officer may have been to scan for possible criminal activity." *Id.*

As explained by this Court in *State v. Burroughs*, 185 N.C. App. 496, 501, 648 S.E.2d 561, 565 (2007), "our holding in *Rose* was that where contradictory evidence exists as to the actual primary purpose of a checkpoint program, the trial court must

examine the available evidence to determine the actual purpose, because bare assertions of a constitutional purpose cannot be allowed to mask actual purposes that are unconstitutional."  As this Court further explained in *Burroughs*, in *Rose*,

> this Court was forced to closely examine the facts surrounding the checkpoint's purpose because its alleged purpose -- to check licenses and registrations, which the Supreme Court has held to be constitutional -- was belied by substantial evidence to the contrary showing the checkpoint's actual purpose was almost certainly to check for narcotics, which the Supreme Court has expressly held to be unconstitutional. This, then, is why this Court held in *Rose* that the trial court was required to make findings of fact as to the checkpoint's purpose:  Not because every trial court in every case must make such findings of fact, but because in this specific case, bare statements that the checkpoint had a constitutional purpose were unreliable.

*Id.* at 502, 648 S.E.2d at 565.

In this case, unlike in *Rose*, there was no evidence presented that suggests that the checkpoint was for any purpose other than to detect DWIs.  Thus, we conclude that the trial court did not err in concluding that the primary programmatic purpose for the checkpoint was DWI detection.  *See Burroughs*, 185 N.C. App. at 503, 648 S.E.2d at 565-66 (holding that evidence was sufficient to establish constitutional purpose when no evidence suggested that stated purpose of checkpoint --

checking for sobriety -- was a mask for another, unconstitutional purpose).

"After finding a legitimate programmatic purpose, the trial court must determine whether the roadblock was reasonable and, thus, constitutional." *State v. Townsend*, ___ N.C. App. ___, ___, 762 S.E.2d 898, 907 (2014). In analyzing the reasonableness of a checkpoint, this Court balances the public's interest and the individual's privacy interest by applying the three-prong test set out in *Brown v. Texas*, 443 U.S. 47, 50-51, 61 L. Ed. 2d 357, 362, 99 S. Ct. 2637, 2640 (1979). "Under *Brown*, the trial court must consider '[1] the gravity of the public concerns served by the seizure[;] [2] the degree to which the seizure advances the public interest[;] and [3] the severity of the interference with individual liberty.'" *Jarrett*, 203 N.C. App. at 679, 692 S.E.2d at 425 (quoting *Rose*, 170 N.C. App. at 293-94, 612 S.E.2d at 342).

"The first *Brown* factor -- the gravity of the public concerns served by the seizure -- analyzes the importance of the purpose of the checkpoint. This factor is addressed by first identifying the primary programmatic purpose . . . and then assessing the importance of the particular stop to the public." *Rose*, 170 N.C. App. at 294, 612 S.E.2d at 342 (internal citation omitted). This Court has held that the first *Brown* factor is

satisfied where the purpose of the stop is DWI detection. *See Townsend*, ___ N.C. App. at ___, 762 S.E.2d at 908. Accordingly, we hold that the first *Brown* factor is met in this case.

The second *Brown* factor "requires the trial court to determine whether '[t]he police appropriately tailored their checkpoint stops to fit their primary purpose.'" *Id.* at ___, 762 S.E.2d at 908 (quoting *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690).

> "Our Court has previously identified a number of non-exclusive factors that courts should consider when determining whether a checkpoint is appropriately tailored, including: whether police spontaneously decided to set up the checkpoint on a whim; whether police offered any reason why a particular road or stretch of road was chosen for the checkpoint; whether the checkpoint had a predetermined starting or ending time; and whether police offered any reason why that particular time span was selected."

*Id.* at ___, 762 S.E.2d at 908 (quoting *Veazey*, 191 N.C. App. at 191, 662 S.E.2d at 690).

Here, the trial court found that the checkpoint was scheduled to run from 11:00 p.m. until 3:30 a.m.; that the location was chosen in advance; the location was selected due to a high vehicle crash rate and high number of DWI arrests in the area, and because there are over 100 restaurants and bars in the area; and that the area had previously been used for checkpoints

approximately four times with double digit DWI arrests per checkpoint. As we have already concluded, these findings are supported by competent evidence in the record.

Defendant, however, points to evidence that the timing and placement of the checkpoints -- two per year in each of 13 divisions throughout the city -- is linked to the availability of the BAT mobile and the timing of the "Booze it or Lose it" campaign. We fail to see how those circumstances conflict with the above findings or otherwise further defendant's argument that the checkpoint was not appropriately tailored to detect impaired driving. Indeed, the BAT mobile allows the officers to conduct the checkpoint more efficiently.

We hold that the trial court's findings "indicate that the trial court considered appropriate factors to determine whether the checkpoint was sufficiently tailored to fit its primary purpose, satisfying the second *Brown* prong." *Jarrett*, 203 N.C. App. at 680-81, 692 S.E.2d at 425. *See also Townsend*, ___ N.C. App. at ___, 762 S.E.2d at 908 (second *Brown* prong satisfied where trial court found that DWI checkpoint had fixed starting and ending times, checkpoint was located near shopping area where alcohol was served, location was selected based on impaired driving statistics, and checkpoint was conducted according to written plan).

Defendant concedes that the third *Brown* factor -- the severity of the interference with individual liberty -- is met. Consequently, we conclude that the trial court's order contained adequate findings of fact, supported by competent evidence, to identify the primary programmatic purpose of the checkpoint and to satisfy the three factors of the *Brown* reasonableness test. These findings in turn support the trial court's conclusion that the checkpoint was constitutional. Accordingly, we affirm the suppression order.[1]

## II

Defendant next argues that the trial court erred by failing to declare a mistrial after the arresting officer testified that he performed a portable breath test on defendant. We review a trial court's decision whether to declare a mistrial for abuse of discretion. *State v. McCarver*, 341 N.C. 364, 383, 462 S.E.2d 25, 36 (1995).

This issue is controlled by *State v. Fuller*, 176 N.C. App. 104, 626 S.E.2d 655 (2006). In *Fuller*, the arresting officer was asked during the defendant's DWI trial what he relied upon

---

[1]Defendant additionally argued that various other findings of fact were not supported by sufficient evidence, but, even accepting without deciding the validity of defendant's arguments, she has failed to show that any of these other findings of fact are material to the trial court's determination of the primary programmatic purpose of the stop and that the roadblock was reasonable. We, therefore, need not address those arguments.

to determine that the defendant was impaired prior to arresting her. He testified that he relied upon "'[a] strong odor of alcohol . . . red glassy eyes, her speech, and then also with the backings of an Alco-Sensor test that was performed.'" *Id.* at 109, 626 S.E.2d at 658. The trial court sustained the defendant's objection to the officer's reference to the Alco-Sensor test and instructed the jury to disregard the statement, but denied defendant's motion for a mistrial. *Id.* at 106, 626 S.E.2d at 657.

On appeal, this Court held that the admissibility of portable alcohol screening tests is governed by N.C. Gen. Stat. § 20-16.3(d) (2003). *Fuller*, 176 N.C. App. at 109, 626 S.E.2d at 658. Pursuant to N.C. Gen. Stat. § 20-16.3(d) (2003),

> [t]he results of an alcohol screening test or a driver's refusal to submit may be used by a law-enforcement officer, a court, or an administrative agency in determining if there are reasonable grounds for believing that the driver has committed an implied-consent offense under G.S. 20-16.2. Negative or low results on the alcohol screening test may be used in factually appropriate cases by the officer, a court, or an administrative agency in determining whether a person's alleged impairment is caused by an impairing substance other than alcohol. Except as provided in this subsection, the results of an alcohol screening test may not be admitted in evidence in any court or administrative proceeding.

The Court in *Fuller* reasoned that the officer's testimony did not violate N.C. Gen. Stat. § 20-16.3(d) because he "did not testify regarding the results of the Alco-Sensor test, only that one was administered." 176 N.C. App. at 109, 626 S.E.2d at 658. Because "[t]he results of an alcohol screening test may be used by an officer to determine if there are reasonable grounds to believe that a 'driver has committed an implied-consent offense under G.S. 16.2[,]'" the officer's "testimony that he relied on the alcohol screening in making the determination that he had reasonable grounds to arrest defendant for DWI was properly admissible." *Id.* (quoting N.C. Gen. Stat. § 20-16.3(d) (2003)).

Subsequent to *Fuller*, our General Assembly amended N.C. Gen. Stat. § 20-16.3(d). *See* 2006 N.C. Sess. Law 253 § 7. N.C. Gen. Stat. § 20-16.3(d) (2013) provides, in relevant part, that:

> The fact that a driver showed a positive or negative result on an alcohol screening test, but not the actual alcohol concentration result . . . is admissible in a court . . . in determining if there are reasonable grounds for believing:
>
> > (1) That the driver has committed an implied-consent offense under G.S. 20-16.2; and
> >
> > (2) That the driver had consumed alcohol and that the driver had in his or her body previously consumed alcohol, but not to prove a particular alcohol concentration.

The amended statute is consistent with *Fuller*'s holding that the fact that an Alco-Sensor test was administered is admissible to show that the arresting officer had reasonable grounds to believe that the defendant had committed an implied-consent offense.

Here, Officer Jamieson testified that he believed that defendant was impaired "based on the [field sobriety] tests, the odor, and a portable breath test." Defendant argues that Officer Jamieson's testimony is distinguishable from the testimony in *Fuller* because "[u]nlike in *Fuller*, where the testimony regarding the Alco-Sensor was made in the probable-cause context, Officer Jamieson's testimony occurred at the close of the State's case, at a point at which the Prosecutor's questions appeared to lead Officer Jamieson to communicate to the jury that, *inter alia*, Defendant was guilty." The testimony in both cases, however, was made in the presence of the jury and in response to a question regarding what the officer relied upon in determining that the defendant was impaired prior to arrest. *See Fuller*, 176 N.C. App. at 109, 626 S.E.2d at 658. Officer Jamieson's testimony, therefore, like the testimony in *Fuller*, addressed the question of probable cause and was admissible under N.C. Gen. Stat. § 20-16.3(d).

Even assuming that Officer Jamieson's testimony was inadmissible, defendant has failed to show that she was prejudiced. Immediately after Officer Jamieson's testimony, the trial court instructed the jury to dismiss the statement and not consider it in its deliberations. Additionally, there was substantial evidence of defendant's guilt. Officer Jamieson testified that defendant had a very strong odor of alcohol coming from her person; that she had red, watery eyes; that she admitted to drinking prior to driving; and that she performed poorly on all three field sobriety tests. Significantly, the Intoximeter breath test indicated that defendant had an alcohol concentration of .08.

The Intoximeter breath test alone constituted sufficient evidence to convict defendant of DWI. *See* N.C. Gen. Stat. § 20-138.1(a)(2) (2013) (providing that person is guilty of DWI if she drives a vehicle "[a]fter having consumed sufficient alcohol that [s]he has, at any relevant time after the driving, an alcohol concentration of 0.08 or more" and that "[t]he results of a chemical analysis shall be deemed sufficient evidence to prove a person's alcohol concentration"). In light of this evidence, defendant has failed to show that there is a reasonable possibility that had the portable breath test not been mentioned, a different result would have been reached at

trial.  *See* N.C. Gen. Stat. § 15A-1443 (2013).  We hold that the trial court did not abuse its discretion by failing to declare a mistrial.

Affirmed.

Judges STEPHENS and ERVIN concur.

Report per Rule 30(e).