IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-470

Filed 7 January 2026

Robeson County, No. 22CR292338-770

STATE OF NORTH CAROLINA

v.

CHADIEZ WHITE, Defendant.

Appeal by Defendant from an order entered 28 October 2024 by Judge G. Frank Jones in Robeson County Superior Court. Heard in the Court of Appeals 28 October 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Sharon Patrick-Wilson, for the State.*

*Attorney Joseph Gerber, for Defendant–Appellant.*

MURRY, Judge.

Chadiez White (Defendant) appeals the trial court's denials of his motions to suppress for improper checkpoint and for lack of probable cause, which followed his conditional guilty plea to possession of firearm by a felon. Defendant challenges several of the trial court's findings of fact as unsupported by competent evidence and argues that the trial court erred by denying his motions to suppress. For the reasons below, we disagree with Defendant and affirm the trial court.

## I.    Background

Captain Michael Seago of the Saint Pauls' Police Department has over thirty-two years of law enforcement experience, including extensive training in criminal investigations, drug enforcement, and narcotics. On 11 September 2022, Captain Seago organized a police checkpoint (or "checking station") on South Old Stage Road in Robeson County. As required by department policy, he prepared a Chapter 20 "Checking Station Plan and Authorization" form for Chief of Police Michael Owens to sign in advance (Authorization Form). The Authorization Form stated the purpose of the checkpoint was to detect violations of the North Carolina motor-vehicle code, N.C.G.S. Chapter 20, including violations of license, registration, and insurance requirements. Although it lacked a written policy, Captain Seago's checkpoint followed the Governor's Highway Safety Program written memorandum (GHSP Template) as a template for establishing checkpoints.

Captain Seago supervised the checkpoint, which operated from approximately 3:00 p.m. to 5:00 p.m. that same day. The checkpoint staffed two marked patrol cars positioned on either side of the road with blue lights activated and visible to approaching traffic, as well as four uniformed officers wearing reflective safety vests. These officers stopped every northbound and southbound vehicle on South Old Stage Road to check for Chapter 20 violations.

Defendant drove up to the checkpoint at approximately 4:24 p.m. When Captain Seago asked Defendant for his driver's license, Defendant replied that he did

not have one. As Captain Seago leaned toward Defendant's driver-side window, he detected a "strong odor of burnt marijuana." After Captain Seago asked about the odor, Defendant showed him a partially smoked joint. Believing the substance within to be marijuana, Captain Seago asked Defendant "if he had anymore marijuana in the vehicle," to which Defendant replied, "No, sir."

Captain Seago instructed Defendant to pull over to the shoulder, exit the car, and stand near the patrol vehicles while officers investigated further. After Defendant exited the car, Captain Seago asked him whether there were any additional drugs or firearms, to which Defendant admitted that he possessed a firearm inside the vehicle and was a convicted felon. Captain Seago searched Defendant's vehicle, finding an assault rifle and a small plastic bag containing what he believed to be marijuana buds. He arrested Defendant at the scene.

On 5 September 2023, a grand jury indicted Defendant for possession of firearm by felon.[1] On 9 October 2024, Defendant filed two motions to suppress the firearm. The first motion argued that Captain Seago's checkpoint was an illegal seizure under the Fourth Amendment to the Federal Constitution, and the second argued that Captain Seago lacked probable cause to search the car because the odor and sight of the legal cannabis product, hemp, is indistinguishable from those of the

---

[1] Defendant was also charged with driving with license revoked, possession of marijuana, and carrying a concealed weapon. The State later dropped these charges.

illegal cannabis product, marijuana. The trial court heard both motions to suppress on 21 October 2024 and reconvened on 28 October 2024 for additional testimony.

At the 21 October 2024 hearing, Captain Seago testified that the checkpoint complied with statutory and constitutional requirements based on the Department's use of the GHSP Template and Chief Owens's pre-approval. When asked about obtaining proper authorization for this checkpoint, Captain Seago replied that "We— I set up a license check," explaining that the "license check [was] authorized by myself." The State introduced the signed Authorization Form into evidence.

Defendant argued that the checkpoint was improper because it had no independent written policy governing checkpoint procedures, no contemporaneous documentation of Chief Owens's approval, and no statistical or empirical basis for choosing the particular checkpoint location. Defendant further argued that the search of his vehicle violated the Fourth Amendment because the odor and sight of marijuana are insufficient to establish probable cause following North Carolina's legalization of hemp in 2019. In support, he introduced a North Carolina State Bureau of Investigation memorandum (SBI Memorandum) acknowledging "significant difficulty" in visually and olfactorily distinguishing marijuana from legal hemp. On 28 October 2024, Captain Seago gave additional testimony at the reconvened hearing, and the State offered the GHSP Template into evidence.

On 4 November 2024, the trial court entered an order denying both motions to suppress, finding in relevant part that:

3) On 11 September 2022 Captain Seago was a sworn law enforcement officer with more than 30 years' law enforcement experience, including training and experience in detecting the odor of burnt and unburnt marijuana by sight and by smell.

4) As of 11 September 2022, Captain Seago had over 500 previous encounters of people possessing marijuana, in which he made arrests, seized the substances for testing, and had the substances found by laboratory analysis to be marijuana.

5) On 11 September 2022, the Town of Saint Pauls, North Carolina did not have an independent written policy governing the conduct of checking stations but utilized and adopted the GHSP Template.

6) On 11 September 2022, Captain Seago organized a checking station to be conducted on South Old Stage Rd., Saint Pauls, North Carolina from 3:00pm to 5:00pm, staffed by three officers and himself. The checking station was approved in advance by Chief Owens.

7) Statistical information was considered in the selection of the location for the checking station.

8) Captain Seago was in charge of the checking station and no subordinate officer had permission or discretion to deviate from the checkpoint plan or policy.

9) Neither Captain Seago nor any subordinate officer deviated from the checking station plan or checking station policy.

10) The purpose of the checking station was to detect Chapter 20 violations.

11) Every vehicle travelling up on South Old Stage Rd. regardless of direction of travel within the perimeter of the checking station was stopped pursuant to the checkpoint plan and policy.

12) The checking station designated in advance the pattern for stopping vehicles (every vehicle traveling upon South Old Stage Rd. regardless of direction of travel within the perimeter of the checking station) and for requesting drivers thus stopped to produce driver's license, vehicle registration, and proof of automobile liability insurance.

13) Although there was no signage, the checking station advised the public that a checking station was being conducted in that two patrol vehicles had blue lights operational during the conduct of the checking station. Additionally, officers conducting the checking station wore police uniforms and safety vests with the word

"POLICE" thereupon.

14) Traffic upon South Old Stage Rd. during the operation of the checking station was moderate, and the movement of traffic was unaffected save and for momentary stops of legitimate motorists.

15) During the conduct of the checking station, every northbound and southbound vehicle traveling upon South Old State Rd. was stopped pursuant to the checkpoint plan and checkpoint policy.

16) An automobile driven by Defendant entered the perimeter of the checking station during its operation and was stopped by Captain Seago.

17) Captain Seago detected, based upon his training and experience, a strong odor of burnt marijuana coming from within the vehicle.

18) Captain Seago asked Defendant to produce his driver's license and registration and Defendant stated that he did not have a license.

19) Captain Seago asked Defendant about the marijuana odor emanating from within the vehicle. In response, Defendant provided to Captain Seago, based upon his training and experience, a marijuana joint that Defendant had been smoking.

20) Defendant did not deny the presence of marijuana or contend that the odor derived from hemp or a source other than marijuana.

21) Captain Seago directed Defendant to pull his vehicle off of the roadway to the shoulder, and the checking station continued uninterrupted while Captain Seago dealt with Defendant.

22) Once Defendant had parked his vehicle on the shoulder, Captain Seago directed Defendant to step out of the vehicle. Captain Seago asked Defendant if there were any other drugs or weapons in the car that might harm the officer. Defendant replied, "*No, but there is a gun in the car, and I am a convicted felon.*"

23) Captain Seago searched the interior of the automobile and located a baggie which, based upon his training and experience, contained unburnt marijuana. Captain Seago also located within the interior of the automobile a 5.56 caliber Delton AR-15 assault rifle under the passenger seat.

24) Defendant did not present evidence apart from the introduction of an SBI Memorandum explaining the difficulties in differentiating between legal hemp versus illegal marijuana due to the similarities in odor and appearance.

(Quotation modified.) The trial court concluded as a matter of law, in relevant part

that:

> 3)  The primary programmatic purpose of the checking station was to detect and deter Chapter 20 violations, which is a valid public safety concern, and the use of checking stations for these purposes is authorized by N.C.G.S. § 20-16.3A.
>
> 7)  Upon consideration of the foregoing factors, the checking station advanced a public interest.
>
> . . . .
>
> 9)  In the totality of circumstances, the restrictions on the discretion of the officers conducting the checking station were sufficient to ensure that the intrusion on individual liberty was no greater than necessary to achieve the checking station's objectives.
>
> 10)  The checking station was organized and conducted in conformity with North Carolina law and did not deprive Defendant of the rights guaranteed him under the Constitutions of the United States or State of North Carolina, respectively.
>
> . . . .
>
> 14)  The odor of marijuana alone is sufficient to establish probable cause to search a vehicle.

(Quotation modified.) Following the denial of his motions, Defendant entered a conditional guilty plea to possession of a firearm by a felon, expressly reserving his right to appeal the suppression rulings under N.C.G.S. § 15A-979(b).[2] The trial court sentenced Defendant to an active term of 12 to 24 months' imprisonment. Defendant timely appealed.

## II.   Jurisdiction

---

[2]   A defendant who pleads guilty may nonetheless appeal the denial of a motion to suppress if the plea is expressly conditioned on that right. *See* N.C.G.S. § 15A-979(b) (2025); *State v. Reynolds*, 298 N.C. 380, 395 (1979). Here, Defendant's written plea agreement and the transcript of plea proceedings both conditioned his plea on preserving appellate review of the trial court's suppression rulings.

This Court has jurisdiction to hear Defendant's appeal of the denial of his motions to suppress under N.C.G.S. §§ 7A-27(b) and 15A-979(b). *See State v. Reynolds*, 298 N.C. 380, 397 (1979) (allowing defendant's appeal of denial of pretrial suppression motion despite his guilty plea).

## III. Analysis

In contesting the denial of his motions to suppress, Defendant challenges several of the trial court's findings of fact as unsupported by competent evidence and argues that the trial court erred by denying his motions to dismiss. For the following reasons, we disagree and affirm the trial court's denial of Defendant's suppression motions.

This Court gives "great deference to the trial court's ruling on a motion to suppress," *State v. Parker*, 277 N.C. App. 531, 538–39 (2021), and "strictly limit[s]" our review of a trial court's denial of a motion to suppress to "determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the [trial court's] ultimate conclusions of law," *State v. Cooke*, 306 N.C. 132, 134 (1982). "Competent evidence is evidence that a reasonable mind might accept as adequate to support the finding." *State v. Ashworth*, 248 N.C. App. 649, 651 (2016). Unchallenged findings of fact "are presumed to be supported by competent evidence and are binding on appeal," *State v. Baker*, 312 N.C. 34, 37 (1984), "even if the evidence is conflicting," *State v. Buchanan*, 353 N.C. 332, 336 (2001). This

Court may "also consider any uncontroverted evidence which was presented at the suppression hearing which would support the trial court's conclusions of law." *State v. Rollins*, 226 N.C. App. 129, 144 (2013). We review the trial court's conclusions of law *de novo. State v. Williams*, 362 N.C. 628, 632–33 (2008).

## A. Challenged Findings of Fact

Defendant challenges Findings of Fact 5–7, 20, 22, and 24 as unsupported by competent evidence. Because he fails to challenge the trial court's remaining findings, we deem them supported by competent evidence and binding on appeal. *See State v. Biber*, 365 N.C. 162, 168 (2011). We review each of the challenged findings in turn. Foremost, we recognize that "the trial court determines the credibility of the witnesses, the weight to be given to the testimony, and the reasonable inferences to be drawn therefrom." *State v. Fields*, 268 N.C. App. 561, 568 (2019) (quotations omitted).

### 1. Findings of Fact 5 and 15

Defendant argues that no competent evidence supports Findings of Fact 5 and 15, which find that, in light of Captain Seago's testimony, the checkpoint "utilized and adopted" the written GHSP Template and stopped traffic "pursuant to the checkpoint plan and policy." He contends that Captain Seago's testimony that the department uses "an unwritten policy" and goes "by the North Carolina Crime Patrol and Public Safety . . . Governor's Highway Safety Program" is insufficient to support these findings

Section 20-16.3A requires police checkpoints to "[o]perate under a written policy that provides guidelines for the pattern, which need not be in writing" so long as "no individual officer . . . [has] discretion as to which vehicle is stopped or, of the vehicles stopped, which driver is requested to produce [a driver's] license, registration, or insurance information." N.C.G.S. § 20-16.3A(a)(2a) (2025). The written "policy may be either the agency's own . . . or . . . of another law enforcement agency." *Id.* But "[i]f officers of a law enforcement agency . . . operat[e] under another agency's policy, it must be stated in writing." *Id.*

Here, the State's GHSP Template and Authorization Form showed a written plan to initiate a checkpoint on South Old Stage Road on 11 September 2022 from 3:00 p.m. to 5:00 pm. The plan states that, at this checkpoint, "officers shall ask the drivers of every vehicle for" their license, registration, and proof of insurance for the purpose of checking "Chapter 20 violations." Further, Captain Seago testified to conducting the checkpoint in accordance with the GHSP Template. He also testified that he prepared the Authorization Form before the operation. He then identified the supervising officer; the date, time, and location of the checkpoint; the number of participating officers; and instructions to stop each vehicle according to a predetermined pattern. He also confirmed that Chief Owens reviewed and signed the form on the same day. The trial court found that the officers conducted the operation in accordance with that written plan—consistent with the GHSP Template—and that the officers followed it without deviation. Because competent evidence supports the

trial court's finding that the checkpoint "utilized and adopted" the written GHSP

Template and stopped traffic "pursuant to the checkpoint plan and policy," Findings

of Fact 5 and 15 are binding on appeal. *See Fields*, 268 N.C. App. at 568.

## 2. *Finding of Fact 6*

Defendant argues that no competent evidence supports Finding of Fact 6 that

Captain Seago "organized" the checkpoint, which Chief Owens "approved in advance."

Defendant argues that Captain Seago "set up his own checkpoint" because his

testimony "corrected 'We' to 'I' in describing who set up the license check" and "used

the awkward phrasing, 'A license check is authorized by myself.' " He further alleges

that Captain Seago improperly signed the Authorization Form on Chief Owens's

behalf because their signatures appeared to be "written by the same hand—which

according to Captain Seago, was his own hand."

The assessment of witness credibility and evidence weight is left to the sole

discretion of the trial court. *See Fields*, 268 N.C. App. at 568. Further, any contrary

evidence does not negate otherwise competent evidence supporting these findings

because "the trial [court] is in the best position to resolve the conflict." *Williams*, 362

N.C. at 632. (quotations omitted).

Here, the State introduced the Authorization Form containing Chief Owens's

signature. It also offered Captain Seago's testimony that he organized the checkpoint

by designating in advance a pattern for stopping vehicles along the highway. The

existence of any contrary evidence does not foreclose the above evidence from

supporting the finding that Chief Owens approved the checkpoint and Captain Seago organized it. Even assuming *arguendo* isolated instances of "awkward[ly] phras[ed]" testimony or similar signatures, we assume that the trial court assessed the weight and credibility of this information along with the rest of the evidence. *See State v. Veazey* (*Veazey II*), 201 N.C. App. 398, 402 (2009). Because competent evidence supports the trial court's finding that Chief Owens approved the checkpoint prior to Captain Seago organizing it, Finding of Fact 6 is binding on appeal. *See Fields*, 268 N.C. App. at 568.

### 3. Finding of Fact 7

Defendant argues that no competent evidence supports Finding of Fact 7 that Captain Seago provided "unchallenged testimony that [he considered] statistical information" when selecting the checkpoint's location. He asserts that Captain Seago's testimony to "follow[ing] policies" by "randomly plac[ing]" the checkpoint is inadequate to support this finding. Section 20-16.3A(d) requires checkpoints to be "random[ly] or statistically indicated" and instructs agencies to "avoid placing checkpoints repeatedly in the same location or proximity." N.C.G.S. § 20-16.3A(d). Thus, competent evidence supports the trial court's finding that Captain Seago complied with statutory requirements. Neither the Fourth Amendment nor § 20-16.3A requires evidence of empirical data or statistical justification for the checkpoint's location. *See State v. Cobb*, 381 N.C. 161, 168 (2022). In any event, § 20-16.3A forbids Defendant from using randomness as "grounds for a motion to

suppress or a defense to any offense arising out of the operation of a checking station." N.C.G.S. § 20-16.3A(d). Therefore, Defendant's argument is without merit and Finding of Fact 7 is binding on appeal. *See Fields*, 268 N.C. App. at 568.

### 4. Finding of Fact 20

Defendant argues that no competent evidence supports Finding of Fact 20 that he "did not deny the presence of marijuana or contend that the odor derived from hemp or a source other than marijuana." At the suppression hearing, the trial court discussed with Captain Seago his drug-related questioning of Defendant. Captain Seago confirmed that he "asked [Defendant] about the odor of marijuana coming out of the vehicle," after which Defendant then showed him a partially smoked joint. When Captain Seago asked Defendant whether "he had anymore marijuana in the vehicle," Defendant replied that he did not.

Captain Seago's testimony indicates that he asked two questions: first about the marijuana odor and second about any additional marijuana. It also indicates that Defendant gave two answers: first, by showing his partially smoked joint, and second, by denying having any additional marijuana in the car. Contrary to Defendant's argument, the fact that he denied having *"anymore"* marijuana in the car does not negate his failure to deny having marijuana in the joint. (Emphasis added.) Furthermore, the record indicates that Defendant never stated or implied that the substance was anything other than marijuana. Because competent evidence supports Finding of Fact 20, it is binding on appeal. *See Fields*, 268 N.C. App. at 568.

### 5.  *Finding of Fact 22*

Defendant argues that no competent evidence supports Finding of Fact 22 that Defendant confirmed his possession of "a gun in the car" and his status as "a convicted felon" after Captain Seago "directed [him] to step out of the vehicle." (Emphasis omitted.) He believes that no competent evidence supports the trial court's "implied" finding that Defendant "might have admitted" to firearm possession "before Captain Seago initiated his search based on . . . probable cause." At the suppression hearing, Captain Seago testified to this exchange in full. Based on that testimony, we hold that competent evidence supports Finding of Fact 22. *See Veazey II,* 201 N.C. App. at 402. We are unpersuaded by Defendant's argument to the extent that he challenges this finding based on the argument that it "implied" that Defendant admitted to being a felon and possessing a firearm before Captain Seago began his search. Defendant notes that "the trial court did not . . . explicit[ly] find[ ] that Captain Seago had an alternative basis for probable cause to search [Defendant's] car." Absent such a finding, any analysis regarding evidentiary support for the trial court's "implications" would be mere conjecture. Thus, competent evidence supports Finding of Fact 22, and it is binding on appeal. *See Fields*, 268 N.C. App. at 568.

### 6.  *Finding of Fact 24*

Defendant argues that no competent evidence supports Finding of Fact 24 that the SBI Memorandum "merely described the 'difficulties' in distinguishing between products that have 'similarities in order and appearance'" because it "stated the

"impossib[ility]" of "distinguishing between the two along the lines of odor or sight." Defendant's purported challenge is merely semantic. The competent evidence supporting the trial court's finding that differentiating between hemp or marijuana is impossible would logically support a finding that doing so is merely "difficult[ ]." Moreover, Defendant's policy arguments regarding the SBI Memorandum do not implicate the competency of the evidence. *See State v. Little*, 295 N.C. App. 541, 555 (2024) (recognizing that trial court correctly refused to take judicial notice of SBI Memorandum with "status of binding law"). Defendant concedes as much in his brief. Thus, Defendant's argument is meritless, and Finding of Fact 24 is binding on appeal. *See, e.g.*, *State v. Rowdy*, 296 N.C. App. 272, 279 (2024), *petition for discr'y rev. allowed in part*, 387 N.C. 421 (2025) (defendant's argument of insufficient evidence that substance was marijuana based on the SBI Memorandum, "even if reasonable, do[es] not alter the scope of [this Court's] review").

For the reasons above, we reject all of Defendant's challenges to the trial court's findings of fact and hold that the trial court supported all challenged findings with competent evidence. Thus, all of its findings denying Defendant's motions to suppress are binding on appeal. *See State v. Byrd*, 287 N.C. App. 276, 279 (2002). As a result, we now review "whether those factual findings in turn support the [trial court's] ultimate conclusions of law." *Cooke*, 306 N.C. at 134.

### B. Motion to Suppress for Improper Checkpoint

Defendant challenges the trial court's legal conclusions that the checkpoint

had a valid primary purpose of detecting and deterring Chapter 20 violations and was reasonable. We disagree.

Both our Federal and State Constitutions protect us "against unreasonable searches and seizures." U.S. Const. amend. IV; *see* N.C. Const. art. I, § 20. Police checkpoints are seizures. *See State v. Mitchell*, 358 N.C. 63, 66 (2004) ("[P]olice officers effectuate a seizure when they stop a vehicle at a checkpoint."). As with all seizures, the "ultimate question . . . is 'whether such seizures are "reasonable" under the Fourth Amendment.' " *Cobb*, 381 N.C. at 165 (quotation omitted). When reviewing the constitutionality of a checkpoint, this Court conducts a two-part inquiry to determine: (1) the checkpoint's primary programmatic purpose and (2) the reasonableness of the stop. *See State v. Veazey* (*Veazey I*), 191 N.C. App. 181, 186 (2008) ("[A] primary programmatic purpose . . . 'does not mean the stop is automatically, or even presumably constitutional' " because the checkpoint must also be reasonable "on the basis of the individual circumstances." (quoting *Illinois v. Lidster*, 540 U.S. 419, 426 (2004)).

### 1. *Primary Programmatic Purpose*

First, we determine whether the checkpoint served a lawful primary programmatic purpose. Defendant argues that the trial court erred in concluding that the checkpoint had a legitimate primary programmatic purpose because its findings were based on "an unexamined reliance on the officer's bare statements" as it "simply accepted Captain Seago's invocation of a permissible purpose without examining

evidence to the contrary." For the following reasons, we disagree and affirm the trial court.

It is well-established that a "search or seizure is ordinarily unreasonable in the absence of individualized suspicion or wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000); *see Terry v. Ohio*, 392 U.S. 1, 20–21 (1968). Checkpoints "can justify the intrusions on drivers' Fourth Amendment privacy interests occasioned by suspicionless stops" when "designed primarily to serve purposes closely related to . . . the necessity of ensuring roadway safety." *Edmond*, 531 U.S. at 41–43. But checkpoints meant to "uncover evidence of ordinary wrongdoing" violate the Fourth Amendment. *Id.* at 42. Furthermore, law enforcement officers may not validate a checkpoint with an unlawful primary purpose, *e.g.*, searching for illegal substances, by adding a lawful secondary purpose, *e.g.*, checking for drivers' licenses. *Id.* at 46. Otherwise, "law enforcement authorities [c]ould . . . establish checkpoints for virtually any purpose so long as they also included a license or sobriety check." *Id.* The trial court must "examine the available evidence to determine the primary purpose of the checkpoint program." *Id.* This examination, however, "is *not* an invitation to probe the minds of individual officers acting at the scene." *Id.* at 48 (emphasis added).

For this reason, "where there is no evidence in the record to contradict the State's proffered purpose for a checkpoint, a trial court may rely on the testifying police officer's assertion of a legitimate primary purpose." *Veazey I*, 191 N.C. App. at

187. But where the evidence "could support a finding of either a lawful or unlawful purpose, a trial court cannot rely solely on an officer's bare statements as to a checkpoint's purpose." *Id.* Instead, the trial court must "close[ly] review . . . the scheme at issue." *State v. Rose*, 170 N.C. App. 284, 289 (2005) (quotation omitted); *see Veazey I*, 191 N.C. App. at 190. Checkpoints that allow officers to identify "drivers' license and vehicle registration violations" serve a lawful primary programmatic purpose. *Id.* at 189; *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (holding a checkpoint for the purpose of checking drivers' licenses and vehicle registration constitutional). Section 20-16.3A permits checkpoints for the primary purpose of "determin[ing] compliance" with North Carolina's motor vehicle code. N.C.G.S. § 20-16.3A (motor vehicle code); *e.g.*, *id.* § 20-7(a) (driver must carry license); *id.* § 20-57(c) (vehicle owner must carry registration); *id.* § 20-313(a) (vehicle owner must maintain insurance policy).

Here, the trial court both found and concluded that the "primary purpose of the checking station was to detect and deter" Chapter 20 violations. At the suppression hearing, Captain Seago testified to "set[ting] up a license check," in which "all of the vehicles coming through" would have "their tags [and] driver license[s] . . . checked." Because Defendant did not present any conflicting evidence, the trial court did not err in relying on Captain Seago's "assertion of a legitimate primary purpose" for the checkpoint. *Veazey I*, 191 N.C. App. at 187. Thus, we hold that the trial court did not err in concluding that the checkpoint served a valid

primary programmatic purpose. *See Edmond*, 531 U.S. at 47.

## 2. *Reasonableness of the Stop*

Second, we consider whether the checkpoint was reasonable—that is, "whether the individual stop at issue was itself constitutional." *State v. Burroughs*, 185 N.C. App. 496, 502 (2007). Defendant argues that the trial court erred in concluding that the checkpoint was reasonable because the evidence does not support the conclusion that "Captain Seago's checkpoint was in the public interest." For the following reasons, we disagree and affirm the trial court.

To determine a checkpoint's reasonableness, the reviewing "court must weigh the public's interest in the checkpoint against the individual's Fourth Amendment privacy interest." *Veazey I*, 191 N.C. App. at 186. In *Brown v. Texas*, 443 U.S. 47, 50 (1979), the U.S. Supreme Court held that the "reasonableness" of a checkpoint "depends on a balance between the public interest and the individual's right to personal security free from arbitrary inference by law officers." *Id.* We balance these interests by weighing (1) "the gravity of the public concerns served by the seizure," (2) "the degree to which the seizure advances the public interest," and (3) "the severity of the interference with individual liberty." *Id.* at 50–51. Where the "balance" of these factors "weigh[s] in favor of the public interest, the checkpoint is reasonable and therefore constitutional." *Veazey I*, 191 N.C. App. at 186. Defendant concedes that the checkpoint "advances the public interest" under *Brown*'s first prong, *Brown*, 443 U.S.

at 50, but challenges "the trial court's weighing of the second and third" prongs as "rel[ying] extensively on incorrect findings of fact."

### a. Advancement of Public Interest

Under *Brown*'s second prong, the trial court must assess "the degree to which the [checkpoint] advances the public interest." *Brown*, 443 U.S. at 51. The trial court should decide "whether the police appropriately tailored their checkpoint stops to fit their primary purpose." *Veazey I*, 191 N.C. App. at 191 (quotation omitted). To determine whether a checkpoint is "appropriately tailored," this Court recognizes several non-exhaustive factors, *e.g.*, "whether police spontaneously decided to set up the checkpoint," whether they "offered any reason why a particular . . . stretch of road was chosen," "whether the checkpoint had a predetermined starting or ending time," and whether they "offered any reason why that particular time span was selected." *Id.*

Here, the trial court found that three of the four suggested factors weighed in favor of the checkpoint's advancement of the public interest:

A) The checking station was conducted pursuant to an organizational plan, staffed by a supervisor and three officers, received prior approval by a non-participant head of the law enforcement agency, and memorialized by advance completion of a written checking station authorization (Authorization Form).

B) The Record is silent except for Captain Seago's unchallenged testimony that statistical information was considered in the selection of the location for this checking station.

C) The Authorization Form demonstrates that a two-hour, operational window between 3:00pm and 5:00pm was selected.

(Quotation modified.) Here, Findings of Fact 5–7, and 15 are binding on appeal and support the trial court's determination that the department considered statistical information when it selected the area of road, planned the checkpoint, identified a specific time period, and operated the checkpoint in accordance with that plan; as well as its conclusion that the checkpoint was appropriately tailored. *See Veazey I*, 191 N.C. at 191. Thus, we hold that the trial court did not err in concluding that the checkpoint advanced the public interest under *Brown*'s second prong. *See id.*

### b. *Interference with Individual Liberty*

Under *Brown*'s third prong, we consider "the severity of [the checkpoint's] interference with individual liberty." *Brown*, 443 U.S. at 51. Law enforcement officers must execute checkpoints "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." *Id.* We recognize the following non-exhaustive factors in reviewing a checkpoint's impact on individual liberty:

> [T]he checkpoint's potential interference with legitimate traffic; whether police took steps to put drivers on notice of an approaching checkpoint; whether the location of the checkpoint was selected by a supervising official, rather than by officers in the field; whether police stopped every vehicle that passed through the checkpoint, or stopped vehicles pursuant to a set pattern; whether drivers could see visible signs of the officers' authority; whether police operated the checkpoint pursuant to any written or oral guidelines; whether the officers were subject to any form of supervision; and whether the officers received permission from their supervising officer to conduct the checkpoint.

*Veazey I*, 191 N.C. at 193. These factors are "circumstances to be considered as part of the totality of the circumstances in examining the reasonableness of the

checkpoint." *Id.* at 193 (citation modified).

Here, in considering the severity of interference with individual liberty, the trial court considered the following factors in relevant part:

A)  The checking station neither potentially nor actually interfered with legitimate traffic. The checking station was organized with brief questioning of motorists for limited purposes, thus posing only limited potential for interference with legitimate traffic;

B)  Although signage was absent, two patrol cars with operating blue lights coupled with uniformed officers wearing safety vests emblazoned with "POLICE" during daylight hours on a two-lane highway sufficiently noticed the public of the operation of this checking station.

C)  The checking station location was selected and approved in advance by the non-participant head of the employing law enforcement agency.

D)  Every Northbound and Southbound vehicle travelling upon South Old Stage Rd. during the conduct of the checking station was in fact stopped.

. . . .

F)  The checking station was conducted in conformity with the Authorization Form and the GSHP Template respectively.

. . . .

H)  The officers received permission from their supervising officer to conduct the checkpoint per the Authorization Form. Additionally, officers conducting the checking station were under the direct supervision of Captain Seago who was present on scene.

(Quotation modified.) Here, Findings of Fact 5–7 and 11–15 are binding on appeal and support the trial court's conclusion that the checkpoint's interference with individual liberty was not so severe as to make the checkpoint unreasonable. *See Baker,* 312 N.C. at 37. Thus, we hold that the trial court did not err in concluding that the checkpoint's "intrusion on individual liberty was no greater than necessary"

under *Brown*'s third prong. *See id.*

Ultimately, the trial court's order denying Defendant's motion to suppress contained adequate findings of fact, supported by competent evidence, to identify the primary programmatic purpose of the checkpoint and to satisfy all three prongs of *Brown*'s reasonableness test. Those findings, in turn, support the trial court's conclusions of law, which demonstrate that trial court's proper determination of the stop's reasonableness. Therefore, the trial court did not err in concluding that Captain Seago's checkpoint served a lawful primary programmatic purpose and was reasonable. Accordingly, we affirm the trial court's order denying Defendant's motion to suppress for improper checkpoint.

## C. Motion to Suppress for Lack of Probable Cause

In the alternative, Defendant argues that the trial court erred by concluding that Captain Seago had probable cause to search his car. He contends that "the mere odor and sight of [Defendant's] burnt cannabis in itself was inadequate to give Captain Seago probable cause to search his car." For the following reasons, we disagree and affirm the trial court.

It is well-established that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). The automobile exception

permits a warrantless "search of a motor vehicle which is on a public roadway . . . if it is based on probable cause." *State v. Isleib*, 319 N.C. 634, 637–38 (1987) (quotation omitted).

As a result, "an officer may search an automobile without a warrant if he has probable cause to believe the vehicle contains contraband." *State v. Springs*, 292 N.C. App. 207, 212–14 (2023). An officer has probable cause when "the facts and circumstances" are "sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *State v. Downing*, 169 N.C. App. 790, 795, (2005) (quotation omitted). As part of the probable-cause determination, trial courts may consider a police officer's "plain" observations, *e.g.*, smell. *Id.* at 796.

In *State v. Dobson*, 293 N.C. App. 450, 454 (2024), *petition for discr'y rev. allowed in part*, 387 N.C. 420 (2025), this Court held that "the legalization of industrial hemp did not eliminate the significance of detecting 'the odor of marijuana' for the purposes of a motion to suppress. The legalization of industrial hemp 'has not changed the State's burden of proof to overcome a motion to suppress.' "*Dobson*, 293 N.C. App. at 450 (quoting *Teague*, 286 N.C. App. at 179). And in *State v. Little*, this Court held that, "despite the liberalization of laws regarding possession of industrial hemp, and even if marijuana and industrial hemp smell and look the same," an officer has probable cause to search a vehicle "based upon the officer's reasonable belief that the substance he smelled and saw in the vehicle was marijuana." *Little*, 295 N.C. App.

at 556. The Court further explained that "[p]robable cause did not require [an officer's] belief that the substance was illegal marijuana [to] be "correct or more likely true than false," but requires only a " 'practical, nontechnical' probability that incriminating evidence involved is all that is required." *Id.* (quoting *Brown*, 460 U.S. at 742). That is, though an officer's belief that what a defendant possessed smelled and looked like marijuana would not alone be sufficient to *convict* the defendant of a crime, that belief is legally sufficient to give the officer probable cause that the defendant was committing a crime. *See State v. Johnson*, 288 N.C. App. 441, 457–58 (2023), *petition for discr'y rev. denied mem.*, 385 N.C. 886 (2024) ("[T]he smell of marijuana alone supports a determination of probable cause, even if some use of industrial hemp products is legal under North Carolina law.").

Here, the trial court's order also contains the unchallenged findings that Captain Seago has "training and experience in detecting the odor of burnt and unburnt marijuana by sight and by smell"; has made "over 500 previous encounters" with marijuana possession; and that he "detected, based upon his training and experience, a strong odor of burnt marijuana coming from within [Defendant's] vehicle." These findings include unchallenged Finding of Fact 19 that Captain Seago "asked [D]efendant about the marijuana odor emanating from within the vehicle. In response, [D]efendant provided to [him], based upon [Captain Seago's] training and experience, a marijuana joint that [D]efendant had been smoking." Here, as in *Little*, the State offered sufficient evidence suggesting that, based on Captain Seago's

training and experience, he smelled the odor of burnt marijuana, and Defendant did not claim to possess only legal hemp.

Thus, we hold that the trial court's findings support its conclusion that Captain Seago had probably cause to search the car when he smelled and saw what he believed to be marijuana. *See Johnson*, 288 N.C. App. at 457–58 (The "smell of marijuana alone supports a determination of probable cause." (citation modified)). And because Defendant did not tell Captain Seago that the substance was legal hemp, Captain Seago had no reason to believe it was anything other than marijuana. *See Little*, 295 N.C. App. at 552–53 (noting that officers had no reason to believe substance was hemp because defendant did not say it was hemp when asked about marijuana odor).

Ultimately, the trial court's order denying Defendant's motion to suppress for lack of probable cause contained adequate findings of fact—supported by competent evidence—to show that Captain Seago reasonably believed that he smelled marijuana. Those findings, in turn, support the trial court's conclusions of law, which demonstrate that the trial court properly determined there was probable cause to search Defendant's vehicle. Therefore, we affirm the trial court's order denying Defendant's motion to suppress for lack of probable cause.

## IV.  Conclusion

For the reasons above, we hold that the trial court did not err by denying Defendant's motions to suppress for improper checkpoint and lack of probable cause.

NO ERROR.


Judges COLLINS and FLOOD concur.